# STATE v. SIRMAY.

No. 2300.    Decided March 9, 1912.    Rehearing Denied April 5, 1912
(122 Pac. 748).

1.  HOMICIDE—EVIDENCE—SUFFICIENCY.    In a prosecution for mur-
der in the first degree, evidence *held* to support a conviction.
(Page 527.)

2.  CRIMINAL LAW—EVIDENCE—ADMISSIBILITY.    While an accused
cannot be compelled to give evidence against himself by sub-
mitting to a comparison of his foot with prints found at the
place of the commission of a crime, at the solicitation of a
sheriff, he voluntarily places his foot in the tracks left by the
criminal or surrenders his shoes to the sheriff for such com-
parison, he cannot object to testimony as to the comparison.
(Page 536.)

3.  CRIMINAL LAW—CONFESSIONS—VOLUNTARY CONFESSIONS.    Where
after the arrest of one accused of murder he was asked to
make a statement, though warned that it would be used
against him, a confession then made is admissible, though ac-
cused was still suffering from the effects of chloroform taken
with suicidal intent, he being in possession of his faculties.
(Page 537.)

4.  CRIMINAL LAW—TRIAL—ARGUMENTS OF COUNSEL.    In a prosecu-
tion for homicide, where the schedule time of a car on which
accused claimed to have ridden was material, a statement by
the district attorney in his argument that as he recalled the
evidence the car left Main street at a certain hour, coupled with
a further statement, when accused made objection that the
time had been misstated, that he would leave it to the memory
of the jurors, was not a prejudicial misstatement of evidence.
(Page 538.)

5.  CRIMINAL LAW—ARGUMENTS OF COUNSEL—OBJECTIONS.    Improp-
er argument of counsel cannot be reviewed where objection
was not made at the time.    (Page 539.)

6.  HOMICIDE—DELIBERATION OF JURY—VIEWING PREMISES.    Comp.
Laws 1907, sec. 4870, provides that when it is proper that
the jury should view the place of the offense the court may
order the jury to be conducted there in the custody of an offi-
cer, and section 4882 provides that if the jury desire to be
informed on any point of law they must require the officer to
conduct them into court where the information must be given

them in the presence of or after notice to the district attorney and the accused or his counsel. *Held,* that a request by the jury made after they had retired to deliberate that they be permitted to view the place where the homicide was committed was properly denied, where notice had not been given to the district attorney or to accused or his counsel. (Page 539.)

7. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE. In a prosecution for homicide, though the time at which defendant boarded a street car was material to corroborate or discredit his statement that he left the place where the homicide occurred a few minutes before the killing, evidence alleged to be newly discovered that the power was off during the trip of the car which defendant claimed to have boarded, and defendant's testimony that the power was off while he was on the car, was not ground for a new trial, not being of such a character as to probably alter the verdict, and defendant having omitted to testify as to the stoppage of the car at the trial. (Page 540.)

APPEAL from District Court, Third District; *Hon. George G. Armstrong,* Judge.

Julius Sirmay was convicted of murder in the first degree, and appeals.

AFFIRMED.

*Dickson, Ellis, Ellis & Schulder* and *Bone & McGee* for appellant.

*A. R. Barnes,* Attorney-General, and *E. V. Higgins* and *Geo. C. Buckle,* Assistant Attorneys-General, for the State.

STRAUP, J.

The defendant was convicted of first degree murder and appeals.

The evidence on behalf of the State shows that the deceased, a boy fourteen years of age, about five feet, six inches in height, and weighing about 130 pounds, was shot and killed at his mother's residence, and where the deceased also lived, shortly after his return from school and while all the members of his family were absent. The residence is

situated on Thirteenth East, between First and Second South
Streets in Salt Lake City. The distance from the schoolhouse
on First South, between Seventh and Eighth East, to the
boy's home is about six blocks, or about six-sevenths
of a mile. His teacher and others testified that on the
day of the homicide the school was dismissed for
lunch at 12:15 p. m.; that the deceased was then in the
classroom, and thereafter left the building to go to his home
for lunch. One of his schoolmates overtook him and left him
at Eleventh East and First South Streets, the deceased walk-
ing east towards his home, and his schoolmate south to his
home. The latter estimated that time to be about 12:25 or
between 12:25 and 12:30. No one saw the deceased there-
after until he was seen staggering from his mother's house
with four bullet wounds in his body—two in his breast, one
in his shoulder, and one in his wrist—and fall dead on the
front lawn. That was at 12:40 o'clock p. m. Two of the
wounds were of such a character as to cause death almost
instantly. One of the witnesses who lived near-by and who
had just alighted from a passing street car testified that there
was a trail of blood up the steps into the house and up the
stairs to the second floor, and a pool or clot of blood not yet
coagulated on the landing. A revolver with four empty and
two loaded chambers, and with which the boy was shot, was
found in the coal scuttle in the kitchen. Two bullets were
found in the boy's body, and two were taken from the wall
on the landing. When the members of the family left the
house in the morning, the doors were all locked and the
windows fastened. But at this time the kitchen door was
standing open and footprints were found leading from it
across the back yard. The window of the basement of the
house, and a door leading from the basement to the floor
above, were broken open. Footprints were found in the
coal dust leading from the basement window. In the base-
ment, tools and clothes were packed in a telescope, all having
been taken from different parts of the basement, and all
found there. The revolver was one possessed by an older
brother of the deceased, and was kept by him in a suit case

under a bed in one of the rooms on the second floor of the house. In the rooms upstairs, bureau and chiffonier drawers had been pulled out, and clothes and various articles and things scattered and strewn about the rooms. A watch and chain and a stick pin belonging to the deceased's mother, and cuff links, rings, a traveling clock, a pair of pliers, and a safety razor and blades belonging to an occupant of the house, were missing. All of these articles were taken from rooms on the second floor. None of them were found in the possession of the defendant.

The defendant for three or four months prior to the homicide roomed at a Mr. Kropf's place, about one mile north of Murray. During part of that time he worked at a distillery for a Mr. Reilly. For some time prior to the homicide he had no steady employment, and just prior thereto complained that he had no money. On the morning of the day of the homicide he told Mrs. Kropf that he had a job to saw wood, and asked for and was given Mr. Kropf's handsaw. That morning, or in the forenoon of that day, he took a street car, and with the saw came to Salt Lake City. He had the saw wrapped in a newspaper. At Salt Lake City he took a street car which passed the house where the homicide was committed. The motorman of that car testified that the defendant was on the front platform of the car, and that he left it at Thirteenth East and First South Streets, not quite half a block from the deceased's residence, at 10:45 or 11:45 a. m., he thought 11:45. The conductor testified that the defendant there left the car at 11:45. They testified that he then had a saw with him wrapped in a newspaper, that he wore a soft gray hat and a gray plaid coat.

Another witness for the state, a boy ten or eleven years of age, testified that he, on Twelfth East Street, about a block away, heard the shots, and that immediately thereafter he saw a man jump or slide down an embankment at or near the rear of the lot of the deceased's residence, run down a driveway, then cross Twelfth East Street, and down Bueno Avenue to Eleventh East Street, and then south; that the man had on a dark gray suit of clothes, a slouch hat without

a band, and had a dark mustache, dark hair, and that he looked like a Mexican, and identified the defendant as that man. The description which the boy gave in some particulars did not answer the description of the defendant. However, there was evidence to show that when the defendant was arrested his complexion was dark, and that he had a several days' growth of a dark beard. This boy was called to identify another man arrested shortly after the homicide and before the defendant was arrested, and identified such other as the one he saw running from the rear of the premises. Then, after the defendant was arrested, and the boy taken to him, he identified the defendant as that man. He testified that the two men looked alike.

Another witness for the state testified that she saw a man wearing a light slouch hat run down the driveway but was unable to identify the defendant. A handsaw was found in the basement of the house which afterwards was identified by the Kropfs as their saw, and the one Mrs. Kropf had given the defendant the morning of the day of the homicide. After the defendant's arrest, the sheriff and others asked him to explain how it was the saw got in the basement, and, upon being questioned about his knowledge of or connection with the homicide, the defendant stated to them substantially the following facts: He said that he had been rooming at the Kropf's, and on the morning of the day of the homicide he got the saw from them to saw wood. He then went to Murray for his mail, and when he went into the post office for that purpose he left the saw standing on the outside. When he came out he met an acquaintance named "Joe," he did not know his last name, a man whom he said he had met in Reno, Nev., some months before. He said they came to Salt Lake together. Joe remained in Salt Lake and the defendant went to Murray, or in that vicinity, where he had been for three or four months, rooming at Kropf's and had worked for Reilly. He stated that when he came out of the post office Joe asked him if he wanted to make some easy money; that he (Joe) knew a place in Salt Lake where the occupants were all absent during the day, and that they could get several

40 Utah—34

hundred dollars. The defendant at first demurred, but finally the two boarded a street car, the defendant with the saw, and that they both came to Salt Lake. They then took a car which passed the residence of the deceased. He stated that they got off the car at First South and Thirteenth East Streets, and that both walked towards the deceased's residence, Joe in advance of the defendant. Joe went to the back door of the house and rapped on and kicked against the door to make sure that no one was at home. Then they went to the basement window. Joe pried it open and the two entered. There they found a door locked leading from one apartment to another. The hinges of that door were broken and removed and the door opened. He stated that Joe told him to gather the tools and things in the basement while he (Joe) went upstairs. In doing so Joe found a door locked leading to the rooms upstairs, which he forced open. The defendant stated that he remained in the basement about three-quarters of an hour, or an hour, during which time he gather tools, clothes, and other articles in the basement from trunks, closets, and rooms in the basement, and placed them in a telescope which he also found in the basement. He further stated that Joe stayed longer than he expected and that he went upstairs, partly opened the door leading to the rooms upstairs, and there saw the deceased going from one room to another carrying what appeared to him to be a waste basket. He stated that he then returned to the basement, left it through the window without taking anything, and in a hurried or brisk walk, like one ordinarily leaving premises, walked from the rear to the front of the building and down the front walk to the sidewalk. There he saw to the south on Thirteenth East Street a street car standing or moving towards him. He stated that he hurriedly walked north to First South, and then three or four blocks west towards the city, when the car overtook him. There he boarded the car and got to Main Street where he stated he took the car for Murray at about 12:15, as first stated by him, and at 12:35, as afterwards stated by him. At that time he took the Murray car and rode south to Fifteenth South. He stated that

he there left the car and walked to Murray because he thought he had no money to pay car fare any greater distance, forgetting at the time that he had in his pocket twenty-five cents which was given to him by Joe in the morning. He then walked to Murray where he purchased some apples, and then walked back to Kropf's place arriving there at three or 3:15 p. m. Thereafter, and on that afternoon, he heard that a boy had been killed. The Kropfs asked him what had become of the saw, he having returned without it. He that evening went back to Murray, purchased a paper, and returned with it and asked Kropf to read it to him. Kropf did so. The next day he purchased another paper which he also took to Kropf and asked him to read it to him. In that paper it was stated that a saw was found in the basement of the house where the homicide was committed. He stated that he believed that circumstance would be taken as pointing to his guilt; that he was without money, and that he went to a drug store, procured chloroform, returned to a creek near Kropf's place, and took the chloroform with suicidal intent. He stated that he knew nothing more until he was found in bed in Kropf's house. The next day he again attempted suicide by cutting the arteries in his wrist with a safety razor blade, but desisted because it was too painful. He at all times asserted to the officers that while he was at the residence of the deceased he remained in the basement all the time; that he was not upstairs, and that he did not shoot the deceased; that he left the house while the deceased was alive and unharmed, and that if the deceased was shot at 12:40, he (the defendant) was then on the street car and on his way to Murray.

It was further made to appear by witnesses for the state that on the afternoon of the day of the homicide Reilly told Kropf that he had heard of the murder. That afternoon, and after the defendant had returned to Kropf's place, and while Kropf was relating the circumstance to Mrs. Kropf, the defendant attempted to hear their conversation and heard a part of it. After Kropf learned of the finding of the saw in the basement, and after he had asked the defendant what he had done with it, and after the defendant had attempted

suicide, Kropf communicated with the officers. The saw was shown to Kropf. He identified it as his saw and the one which had been given the defendant on the morning of the day of the homicide. The defendant was thereupon arrested and committed. He was thereafter taken to the deceased's residence by the sheriff and a number of police officers. There the defendant was asked to remove his shoes. He did so. They compared them with the footprints found in the back yard leading from the house towards the embankment. Later the defendant was taken to the Utah state prison where he was interrogated by the sheriff and the warden. The defendant there was told by them that they desired to talk to him and to have him tell all that he knew of the homicide, but that he need not tell them anything if he did not choose to do so, and that whatever he said to them would be used against him. There were some statements made by some of the officers that he had better state to them all that he knew about the homicide, but in that connection he was also told that he need not do so, and that if he did tell them anything it would be used against him. With these admonitions, and with this understanding, the defendant told them the facts as hereinbefore enumerated.

Two officers of the sheriff's force, and one from the police force, testified that, as a result of a comparison of the defendant's shoes with the tracks, it was their opinion that the tracks could have been and were made by the defendant's shoes. Some of them, however, stated that the tracks in some particulars did not correspond with the shoes, but attempted to explain that. Three officers of the police force testified for the defendant that in their opinion the tracks could not have been and were not made by the defendant's shoes. The defendant was a witness in his own behalf and testified to the facts substantially as stated by him to the sheriff and the warden. He denied that he was in any part of the residence of the deceased except in the basement, and testified that he did not shoot the deceased, and that he was not the man who ran from the rear of the premises. Another witness testified for the defendant that she was in her house looking out of a

window and saw a man running down Bueno Avenue; that she only saw his back; that he wore a light hat, but testified that from the general appearance of the defendant, his age, height, and size, she was positive that the man who ran down Bueno Avenue was not the defendant. The operators of the Murray car testified that the defendant alighted from that car at Fifteenth South Street, either the one which left Salt Lake at 12:35 or 2:35; they were not certain which. Another witness testified for the defendant, a clerk in the post office at Murray, that the defendant on the morning of the day of the homicide entered the post office, called for his mail, and that when he left the post office he met and talked with another man who answered the description which the defendant gave of the man Joe. The Kropfs testified that when the defendant left their place that morning he wore a brown derby hat. They also testified that the defendant had roomed at their place three or four months, and they and Reilly testified that he had worked for Reilly. It was also made to appear that the defendant had, and there was found in his possession at the time he was arrested, a soft slouch hat, not of a gray, but of a brown, or, as the witnesses described it, a reddish, color.

The forgoing is in substance all of the evidence. We have thus referred to it somewhat in detail because of the assignment and of the claim made that the evidence is insufficient to support the verdict. It is stated by the defendant's counsel that the evidence is not sufficient to show that the defendant shot and killed the deceased, and that the evidence does show that Joe shot and killed him. This is based upon the claim that the evidence shows that the tracks were not made by the shoes worn by the defendant; that the identification of the defendant by the ten or eleven year old boy was of such doubtful and uncertain character as to be valueless; that a witness for the defendant testified positively that the defendant was not the man who ran down Bueno Avenue; that all the witnesses stated that the man who ran from the rear of the premises and down the driveway and down Bueno Avenue wore a light slouch hat, and that

the defendant on that day wore a brown derby hat; that the description of the clothes worn by that man did not correspond with the clothes worn by the defendant on that day; that the defendant took the Murray car at Main Street and First South at 12:35, and that at 12:40, when the deceased was shot, the defendant was five or six miles from the scene of the homicide; and that none of the missing articles taken from the house were found in or traced to the possession of the defendant. If there had been no more than the testimony of the ten or eleven year old boy, and the footprints, to connect the defendant with the commission of the crime, it might well be said that such evidence was not sufficient to connect the defendant with the commission of the crime. But the defendant stated to the officers, and he himself testified, that he entered the house to commit burglary, and that he was in the basement of the house for three-quarters of an hour or an hour. True, he stated and testified that he and another (Joe) entered the house for such purpose; that he and Joe rode on the street car from down town to Thirteenth East and First South where both of them got off the car and walked south towards the deceased's residence, Joe in advance of the defendant. But the street car men testified that the defendant was alone on the front end of the street car, and that he alone got off the car at the place where he testified that he and Joe got off. There is no evidence to show that another was with the defendant at the house except the testimony of the defendant. That testimony, at least in part, was disputed by the street car men. He further admitted to the officers and testified on the stand that, after he was in the basement for three-quarters of an hour or more, he went to the door leading from the basement to the rooms upstairs to see what had become of Joe. There he plainly saw the deceased passing from one room to another; that he then returned to the basement, climbed out of the window, went around the house, down the front walk, and then walked three or four blocks, took the street car, rode to Main Street, and took the car for Murray at 12:35. He stated to the officers and he testified that it was that car which

he took, and not the car which left at 2:35, for he looked at the clock and saw that it was then 12:35. The defendant's seeing the boy in the house and his taking the Murray car at Main Street at 12:35 were, upon the undisputed facts, things almost impossible.

It was shown without dispute and by very direct and positive testimony that the school where the deceased was was dismissed for lunch at 12:15 and that he was then there in the classroom. The distance from the school house to his residence was six blocks, six-sevenths of a mile, the blocks, including the streets, being nearly forty-six rods. He was last seen alive at Eleventh East and First South, about two and one-half blocks from his residence, at about 12:25, walking towards his home. He must have arrived at his residence at about 12:27 or 12:30, more likely the latter. At least the jury could so have calculated, estimated, and believed. It is not unreasonable or improbable, but very reasonable and very probable, that the deceased arrived at his house not earlier than 12:27 or 12:30. The jury also had the right to consider that it took some little time for the deceased to unlock the door, enter the house, and move about before the defendant ascended from the basement, opened the door, and saw the deceased as testified to by the defendant. The jury also had a right to consider that it took the defendant some little time to return to the basement, climb out of the window, walk around the house and to the sidewalk and to the corner of Thirteenth East and First South, and that it took him six or seven minutes to walk three or four blocks, as testified to by him, before the street car overtook him, a distance of about 137 or 138 rods, though he walked hurriedly or briskly as testified to by him. It was also shown, and the jury had the right to so find, that it would take from six to eight minutes for the street car to run to Main Street from the place where the defendant boarded it—a distance of nine or ten blocks—more than a mile. The jury therefore had the right to believe that it was highly improbable, if not almost impossible, that the defendant was at Main Street and First South and there took the Murray car at 12:35, as tes-

tified to by him. True, the Murray car may have been late; but the defendant testified that it was not late, and that he looked at the clock, and that it was then 12:35. It was shown that the defendant that day took a car from Salt Lake to Murray. That was testified to by the operators of the street car. But upon the evidence the jury had the right to believe and to find that the defendant boarded the car which left Salt Lake not at 12:35 but at 2:35. It is argued by his counsel that if he took the car at 2:35 it was not possible for him to get off the car at Fifteen South, walk to Murray, and then back to Kropf's, and arrive there at 3:15. But the fact that the defendant walked to Murray from Fifteenth South and then back to Kropf's rests entirely upon his own testimony. The jury may have believed that he did not do that, and that he walked to Kropf's place direct from Fifteenth South. Upon the evidence, they had the right to so believe and to so find. The jury may also have believed, and upon the evidence they had the right to believe and find, that the defendant alone entered the house where the homicide was committed, and that the person whom he called Joe was not with him, and that it was the defendant who shot and killed the deceased. This is a case where of course some of the material facts are in conflict; but it is one where the determination of the facts was peculiarly within the province of the jury. We cannot say that the conclusion reached by them is not supported by the evidence. We have carefully examined all of the evidence, and we are satisfied that the verdict is amply supported by it.

Complaint is made of receiving the testimony of the witnesses for the state as to the result of the comparison of the defendant's shoes with the footprints. It is urged that the defendant was compelled by the sheriff to go to the premises where the homicide was committed, there to take off his shoes for the purpose of making the comparison, and that such conduct on the part of the sheriff was in violation of the constitutional provision that the accused shall not be compelled to give evidence against himself. It is generally held, and as stated in 12 Cyc. 402, that although

evidence, including documents and other articles, may have been obtained in a criminal case by unfair or illegal methods, it is nevertheless, as a general rule, admissible if relevant, provided the accused is not thereby compelled to do any act which incriminates him, and the confession or incriminating admission is not extorted from him; and by the weight of authority it is held to be error to compel the accused to submit to a comparison of footprints and to permit a witness who was present when the accused was forcibly compelled to place his foot in footprints, or to surrender his shoes for the purpose of making a comparison, to testify as to the result; but where the accused voluntarily places his foot in the tracks, or surrenders his shoes to the sheriff, he cannot object to evidence that they seemed to fit. Cases supporting the text are there cited. Extended notes are found in 8 L. R. A. (N. S.) 762, and 59 L. R. A. 465. We think the evidence here shows that the defendant was not compelled to take off his shoes or to surrender them to the sheriff against his will. The evidence shows that the officer asked him to take them off, and that the defendant willingly and voluntarily did so and surrendered them to him.

It is further contended that the admissions or confession made by the defendant to the sheriff and to the warden were not voluntary, and that the defendant at the time of making them was in such a mental and physical condition, and was so suffering from the effects of the attempted suicide, as not to fully comprehend and undertsand the things said to and by him. The evidence shows that several days before the making of these statements, as already stated, the defendant took chloroform with suicidal intent. In doing so his mouth and throat were burned, and at the time of the making of the statements his mouth and throat were sore. He then complained of pain and stated that he was tired and sleepy. The interview lasted several hours, and until about 1 o'clock at night. The evidence, however, shows that the defendant was in full possession of his faculties, and that he was not at that time suffering from the effects of the chloroform, except from the sore condition of

his mouth and throat, and that he fully comprehended and understood everything that was said to him and everything that was said by him. During the interview he frequently called for water which was given to him. Before he made any statements, he was told by the officers that they desired to talk to him, but that he need not do so unless he chose to do so, and was clearly given to understand that whatever was said by him to them would be used against him. It was made to appear that no persuasion or coercion was used, and that the statements made by him were made willingly and freely, and without promises or inducements of any kind. We are clearly of the opinion that the admissions so made by the defendant were made voluntarily, and that they were properly received in evidence. Furthermore, the testimony as given by the defendant on the witness stand, both in essentials and in details, corresponded with the statements and admissions so made by him to the officers.

It is further claimed that the district attorney, in his argument to the jury, misstated the evidence. The evidence shows that the Murray car left Salt Lake City at Main Street and First South at 12:35 p. m., and that it left another street before reaching First South and Main Street at 12:32. The district attorney in his argument stated that, as he recollected the evidence, the car left Main Street and First South at 12:32. Counsel for the defendant immediately corrected him and stated that it was 12:35, and insisted that the district attorney had misstated the evidence in that particular, and asked that the record be read. The district attorney thereupon stated that "I will leave it to the memory of the jurors." We think the matter is insignificant. The district attorney only stated to the jury his recollection of the evidence. The jury on the evidence could determine whether the car left Main Street and First South at 12:35 or 12:32. They well understood that such fact was to be determined by them from the evidence, and not from the statements of counsel, and to that effect was the jury instructed.

The assistant district attorney in his argument referred to the defendant as a "hobo." This characterization evi-

dently was based on the testimony of the defendant's previous history. It may have been somewhat overdrawn, but no objection was made at the time to such remarks, and the defendant cannot now be heard to complain of them.

We have a statute (Comp. Laws 1907, sec. 4870) which provides that, "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of the officer, to the place," etc. A further statute (section 4882) provides that, "After the jury shall have retired for deliberation, if there is any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the county (district) attorney and the defendant or his counsel." After the case was submitted to the jury, and while they were deliberating upon their verdict, the jury sent a request by the bailiff to the court that they be taken to and permitted to view the house where the homicide was committed. The court, without notifying either the district attorney or the defendant or his counsel, denied the request. It is now urged that such action on the part of the court constituted the holding of a communication by the court with the jury in violation of section 4882. We do not think so. We think that such action on the part of the court does not fall within the provisions of section 4882, and that the request was properly denied by the court. Moreover, it is somewhat doubtful whether the court was authorized, after the case was finally submitted to the jury, to permit them to then view the premises. At any rate, it is very clear that no error was committed by the court in denying the request.

It is also urged that the court erred in overruling the defendant's motion for a new trial. The verdict was rendered

January 17, 1911. On the 21st the defendant filed a motion for a new trial on grounds other than that of newly discovered evidence. The hearing of that motion was continued until the 14th of March. On the 10th of March the defendant filed another motion for a new trial on the additional ground of newly discovered evidence supported by affidavits also filed at that time, that for a few minutes the power was off the Murray car which left Salt Lake City for Murray at 12:35 on the day of the homicide, while it was between Fourteenth and Fifteenth South, and that the power was not that day off any other Murray car. The defendant also filed an affidavit that the power was there off the car on which he that day rode from Salt Lake to Fifteenth South. The motion was heard and overruled on the 14th of March. Complaint is made of this ruling. We think no error was committed in such particular. At the trial, the defendant did not testify that the power at any place was off the car on which he rode from Salt Lake to Fifteenth South. It seems such fact was not made known by him until it was discovered that the power on the day in question was off the Murray car which left Salt Lake at 12:35, and while it was between Fourteenth and Fifteenth South. The newly discovered evidence is not of such a character as to justify the conclusion that upon a new trial with such additional adduced evidence a result different from the verdict rendered ought to be or probably would be obtained.

No complaint is made of the charge of the court. We, however, have examined it and see no error against the defendant in such particular. His theory of the case was fully and fairly submitted to the jury. The record of his conviction is free of error.

We therefore are of the opinion that the judgment of the court below ought to be affirmed. It is so ordered.

FRICK, C. J., and McCARTY, J., concur.