## PERRYGO v. UNITED STATES.

(Court of Appeals of the District of Columbia. Submitted October 1, 1923. Reargued October 7, 1924. Decided November 3, 1924.)

No. 3954.

**1. Criminal law ☞519(3)—Confession induced by confronting defendant with girl to whom he was engaged held involuntary.**

Confession of 17 year old defendant of low mentality, who had persisted in his denial of guilt for more than an hour and a half while surrounded by four and at times by five police officers, and who did not admit that he was guilty of murder until girl to whom he was engaged to be married was brought into the room, *held* involuntary.

**2. Criminal law ☞671—Jury should not hear testimony concerning confession until admissibility has been determined without jury's presence.**

In a murder case, jury should not be permitted to hear testimony concerning a confession until admissibility has been determined by court out of presence of jury.

**3. Criminal law ☞517(1) — Involuntary confession should be excluded.**

Confession which is not the result of purely voluntary mental action should be excluded.

**4. Criminal law ☞736(2) — Question as to whether confession was voluntary may be submitted to jury, where evidence is conflicting.**

Where there is a real conflict in the evidence as to whether confession was result of compulsion, and court initially determines that it was voluntary, the question may nevertheless be submitted to the jury under proper instructions.

Appeal from the Supreme Court of the District of Columbia.

Edgar Randolph Perrygo was convicted of murder, and he appeals. Reversed and remanded.

James A. O'Shea and John I. Sacks, both of Washington, D. C., for appellant.

Peyton Gordon, J. H. Bilbrey, and J. J. O'Leary, all of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, ROBB, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

ROBB, Associate Justice. Appeal from a verdict and judgment in the Supreme Court of the District, under which appellant was found guilty of murder and sentenced to suffer death.

Under the view we take of the case, the only assignment of error necessary to be noticed is that relating to the introduction by the government of the confession of the appellant, defendant below. The evidence, aside from the confession, tended to show that the defendant, then 17 years of age and of rather low mentality, was about to marry a girl one year younger, and, being without funds and believing that a Mrs. Faithful, an elderly lady whom he knew, kept quite a large sum of money on her person, went to her house and attempted forcibly to take the money from her. Finally, to accomplish his purpose, defendant struck down Mrs. Faithful with an iron bar, secured the money, and fled the premises; the woman dying soon after. This occurred about 1 o'clock in the afternoon, and within two or three hours defendant was arrested and taken to the Fifth Precinct police station in this city, where he was searched in the presence of four police officers. Fifty dollars in bills were found on his person. In response to questions as to where he had obtained this money, he asserted he had worked for it, and denied he had struck Mrs. Faithful. He then was taken to police headquarters, arriving at the office of Inspector Grant there at about 4:30. He then was questioned by the inspector and the other officers present, but adhered to his original statement.

A witness for the government, Detective Sergeant Hughlett, testified "that defendant was questioned for an hour and a half by all present before he made a statement. For the hour and a half he was questioned as to his movements on this day, first by the inspector, and then by the others present. * * * We questioned him about this money, and he still stuck to it that he had worked for it, with his father, and had got $5 a month; that he took this drink and became unconscious for several hours. Finally we sent out and got the girl in the case [Mabel Hill], and brought her up. She was brought into the room, and after she went out he said, 'I am going to tell the truth about this thing,' and then he started to relate just what had occurred." This witness "did not recall" that after Mabel Hill had been brought into the room the defendant was told, "Come on, Perrygo; you had better tell the truth now." On cross-examination, witness admitted that defendant had complained during the time of having headache. Over the objection and exception of the defendant, this witness was permitted to relate the oral confession of the defendant, and the government then was permitted to introduce in evidence the defendant's written confession; his oral statement having been reduced to writing immediately after he made it.

Detective Sergeant Connors, who was present at both No. 5 precinct and police

headquarters, on being subjected to a preliminary examination to determine the admissibility of his testimony as to the confession, stated that before the confession was obtained Mabel Hill was brought into the room and defendant was told: " 'Now, this girl is here; you might as well tell the straight story about this affair; it is probably best for you in the end, while whatever you might say here will be evidence in court; it will be offered as evidence in court;' that no stenographer was present at this time; that this statement was made to defendant by Inspector Grant before the paper was signed, up to which time defendant had said that he did not remember anything about the occurrence; that it was after being confronted with the girl, Mabel Hill, and the statement made to him, 'It will probably be best for you in the end,' etc., that the defendant made the statement respecting the case." Thereupon the court stated "that so far as confession was admitted and attempted to be proved by witness on the stand, if the recollection of witness was correct, he had testified to matters which would render the confession inadmissible so far as witness was concerned."

Detective Lynn, who was present when the confession was obtained, remembered that when defendant "was first brought in there he did not say that his head ached, but some time a little later on he did complain of feeling bad; he said he had a headache and felt sick; that Mabel Hill was brought into the room where defendant was; that witness could not say that at the particular time the Hill girl was brought in that Inspector Grant was talking to the boy; that the inspector was there with the other men from the time he was taken to headquarters, which was around 4 o'clock, up to the time the Hill girl was brought in. During that time the boy was being questioned by all of the members of the Metropolitan police department present in the room; that they were asking him questions from around 4 o'clock, when he was brought to headquarters, until about 7 o'clock, when he made a statement; that he made the statement after the Hill girl had been brought into the room; that Mr. Connors was there in the room all the time that witness was there; that witness does not remember whether or not Inspector Grant said to the defendant, just after Mabel Hill had been brought into the room, 'Here is Mabel Hill, now; it will probably be best for you if you tell how this thing happened;' that witness could not say whether he did or did not say those words to the defendant; that witness does not remember; that it was after Mabel Hill was brought in the room that the boy made the statement; that Inspector Grant was standing over at the desk, over by the girl, Mabel Hill, when he made the confession; * * * that from 4 o'clock, up to the time the girl was brought into the room, all the defendant would say was, 'I don't remember;' * * * that while in Inspector Grant's office the girl had nothing to say to the defendant, nor he to her."

Another government witness, Michael Raedy, a police sergeant at the time of the confession, testified "that defendant was continuously questioned at headquarters; that, so far as witness remembered, defendant did not leave Inspector Grant's office from 4 o'clock until after the statement had been obtained; * * * that before the statement was signed witness did hear Inspector Grant say to the defendant, 'Now, this girl is here, and you might as well tell the straight story about this affair; it is probably best for you in the end; while whatever you might say here will be evidence in court, it will be offered as evidence in court." Later this witness denied that he had heard Inspector Grant say to the defendant that he had better tell a straight story. Asked what he meant by his first statement, witness replied: "I meant then that that question had not been put to him, all of that question; in fact, it had never been put to him in my presence, or I didn't hear it, but the part that I related a moment ago, before he started to make his statement, Inspector Grant said, 'Whatever you might say now will be used for or against you.' He told him that."

Witness further testified that before Mabel Hill was brought into the room no statement could be obtained from the defendant, who would answer, " 'Don't remember;' that is about all we could get out of him. * * * Then we went for this girl, Mabel Hill." It was the recollection of this witness that the defendant and the girl were permitted to converse in whispers, but his testimony on this point is flatly contradicted by the other police officers, and is inconsistent with the surrounding circumstances. Moreover, it appears from the testimony of Mabel Hill, a witness for the defendant, that, before she was taken into the presence of the defendant, Inspector Grant talked with her for about half an hour, and

that she was not permitted to talk to the defendant, "save to say to him, 'Hello.'"

The court, over the objection and exception of the defendant, permitted the witnesses who did not remember hearing the inducement made to the defendant, to testify as to the verbal confession made by him. This verbal confession, as already noted, had been reduced to writing on the same occasion and signed by the defendant, and this paper also was received in evidence, over the objection and exception of the defendant; the court submitting to the jury the question whether the verbal and written confessions had been "freely and voluntarily made."

In Wan v. United States, decided by the Supreme Court of the United States on October 13, 1924, 45 S. Ct. 1, 69 L. Ed. ——, the court said: "In the federal courts, the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was in fact voluntarily made. A confession may have been given voluntarily, although it was made to police officers, while in custody, and in answer to an examination conducted by them. But a confession obtained by compulsion must be excluded, whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise." In that case, as here, the question whether the confession was voluntary had been submitted to the jury. The court ruled, however, that the testimony of the superintendent of police, three detectives, and the chief medical officer "left no room for a contention that the statements of the defendant were, in fact, voluntary," since "the undisputed facts showed that compulsion was applied."

In Bram v. United States, 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568, the captain, his wife, and the second mate of the ship Herbert Fuller had been murdered on the high seas, and both Bram, the first mate, and a seaman named Brown, were suspected of the crime. When the ship reached Halifax, N S., Bram was taken in charge by a police officer and questioned; the officer telling Bram that Brown had stated he saw Bram do the murder. Whereupon Bram said, "He could not have seen me; where was he?" The officer answered, "He states he was at the wheel." Bram then said, "Well, he could not see me from there." The court ruled it was error to permit this statement

to go to the jury, saying that "it was doubtless offered as a confession, because of an implication of guilt which it was conceived the words of the denial might be considered to mean. But the situation of the accused, and the nature of the communication made to him by the detective, necessarily overthrows any possible implication that his reply to the detective could have been the result of a purely voluntary mental action; that is to say, when all the surrounding circumstances are considered in their true relations, not only is the claim that the statement was voluntary overthrown, but the impression is irresistibly produced that it must necessarily have been the result of either hope or fear, or both, operating on the mind." The court further ruled that, although the fact that the confession was made to a police officer while the accused was under arrest did not necessarily render the confession involuntary, it nevertheless might be an important element in determining that question.

[1] In the present case, according to the evidence for the government, the defendant, within a few hours of his arrest, examination, and confession, had murdered a helpless old woman and turned over to the girl he was about to marry the money he had obtained thereby. After his arrest he complained that he "had a headache and felt sick," and, unless he was utterly bereft of human emotions, that was a mild characterization of his condition. In addition, he was but 17 years old and of low mentality. We do not mean to intimate that he could not understand right from wrong, but we do mean that his age and mentality are important factors in determining whether, in the circumstances admittedly surrounding him, his confession was voluntary. Surrounded as he was by four and at times by five police officers, who all questioned him, he persisted in his denial of guilt for more than an hour and a half, and it was not until the girl Mabel Hill was brought into the room that he made an inculpatory statement. There is positive evidence, introduced by the government, that Inspector Grant said to the defendant, "Now, this girl is here; you might as well tell the straight story about this affair; it is probably best for you in the end." While Officer Hughlett "did not recall" that such an admonition had been given, and Officer Raedy first admitted and then denied that it was, the significant and uncontradicted fact remains that the presence of this girl, to whom he

had intrusted the fruits of his crime, exerted an influence more potent than the insistent questions of the police officers.

As was suggested in the Bram Case: "The human mind under pressure of calamity is easily seduced, and is liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or a truth, as different agitations may prevail." The undoubted purpose of confronting the defendant with the Hill girl was to induce him to make an incriminatory statement. No other purpose could have been subserved by her presence. It was a play upon the emotions and credulity of the defendant at a time and in circumstances calculated to produce the expected result—a confession. Placed as he was, harassed in body and mind as he must have been, he well may have thought either that the girl had implicated him or that unless he made a statement she would be held as an accessory. The measure of coercion was far greater, in our view, than in the Bram Case, where the defendant was the first mate of a vessel, a hardy seaman of mature years. There Bram had not been subjected, as was this defendant, to a grueling examination by several police officers, but, as the court found, he was placed in a position where, if he failed to speak, his silence might indicate guilt.

Officer Connors, a government witness, testified positively as to what was said to the defendant by Inspector Grant when the Hill girl was brought into the room, and the witness was not permitted to testify as to the forthcoming confession. Because other officers did not remember that Grant had made such a statement, they were permitted to testify, and the jury to speculate as to the effect upon the mind of defendant of the circumstances leading up to and culminating in the confession. This was error. Whether Inspector Grant used the words attributed to him by Officer Connors is immaterial. The circumstances were such that it was quite unnecessary for the inspector to say anything. The intended and undoubted impression upon the mind of the defendant when he thus was dramatically confronted with the girl cannot be better expressed than, in the words attributed to Grant, namely, "Now this girl is here; you might as well tell the straight story about this affair; it is probably best for you in the end."

[2-4] Articulation was unnecessary, since the circumstances spoke louder than words. In a case of this kind, the jury ought not to be permitted to hear any testimony concerning a confession until its admissibility has been determined by the court, out of the presence of the jury. In the present case, after all the testimony concerning the confession had been introduced, the undisputed facts showed that the statements made by the defendant could not have been the result of purely voluntary mental action. In such a situation, it was the duty of the court to exclude the confession. Had there been a real conflict in the evidence, as to whether or not the confession was the result of compulsion, and the court had initially determined that it was voluntary, the question nevertheless might have been submitted to the jury under proper instructions. Wilson v. United States, 162 U. S. 613, 624, 16 S. Ct. 895, 900 (40 L. Ed. 1090), where the court said: "When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury with the direction that they should reject the confession if upon the whole evidence they are satisfied it was not the voluntary act of the defendant." In such circumstances, the defendant would have no cause for complaint, since the confession would be rejected if the jury disagreed with the court, and if the jury agreed with the court defendant would be in no worse position than if no submission had been made.

While it is to be expected that police officers will manifest zeal in the detection of crime, the citizen is entitled to the protection secured to him by our Constitution and laws. It is apparent that the defendant, in a case like the present, not only is at a serious disadvantage during a grueling examination by several police officers, but that this disadvantage attends him at the trial, when the officers may or may not remember all that occurred at the examination. So-called third degree methods have no place in our civilization.

The judgment must be reversed, and cause remanded for a new trial.

Reversed and remanded.