## McAFFEE v. UNITED STATES.
### No. 7472.

United States Court of Appeals for the

District of Columbia.

Decided March 18, 1940.

Writ of Certiorari Denied June 3, 1940.

See —— U.S. ——, 60 S.Ct. 1094, 84 L.Ed. ——

Robert I. Miller and Joseph A. Mc-Menamin, both of Washington, D. C., for appellant.

David A. Pine, U. S. Atty., and William Hitz and Charles B. Murray, Asst. U. S. Attys., all of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

MILLER, Associate Justice.

Appellant has been twice convicted of murder in the first degree, for the killing of a woman named Henrietta B. Anderson. On a former appeal the judgment of the lower court was reversed because of errors in the instructions given to the jury.[1] On this appeal, as in the earlier one, the assignment of error most strongly urged concerns the admissibility of confessions made by appellant a few hours after the commission of the homicide. Appellant's contention upon this point is summarized in his brief as follows: "A confession, to be voluntary in law, must be voluntary in fact. It cannot be voluntary in fact or law if the one making the confession is in such a state of mind, from constant harassment and questioning, coupled with the fogginess of brain one suffers from severe alcoholic intoxication, as to want to commit suicide. A person in such a state of mind could not make a voluntary confession."

The lower court ruled that the question of voluntariness of the confessions should be left to the jury and granted the following instruction as requested by appellant:

"The jury are instructed that in determining whether the alleged confession or confessions were voluntary or not they should consider the relation of the parties; the conversations between the officers and the defendant, if any; the time and place where the alleged confession or confessions took place; the physical condition of the

---

[1] McAffee v. United States, 70 App.D.C. 142, 105 F.2d 21.

defendant; and all the circumstances surrounding its making."

Thereafter, it instructed the jury further upon its own motion, as set out in the margin.[2] These instructions presented the question to the jury, adequately and fairly, and no contention is made to the contrary. Under the law as heretofore established in

[2] "Now, this brings me to a subject of importance. It concerns the contentions which are made by the defendant. They relate to the statements of the defendant allegedly made at the third precinct about 5 a. m. on that Monday when it is testified that he admitted that he had killed Mrs. Anderson with a shaker, and of those later oral statements which followed after he was taken to the house and pointed out certain articles and made certain statements concerning his acts. Let us call them the oral confession of the defendant. Then we have what has been referred to as the written confession of the defendant which, it is claimed, was made at police headquarters about 7:30 a. m. of the same Monday, by oral statements of the defendant taken down on the typewriter, read by the defendant, and signed by him.

"Of course admissions or confessions freely and voluntarily made by one possessed of his senses and knowing what he is saying and doing are evidence tending to prove guilt. That is important evidence bearing upon the question of guilt. The contention is here made, however, that these admissions and statements, whether oral or written, were not voluntary and free; that they were the product of a mind benumbed or confused by alcohol, made at a time when the defendant himself had no understanding or realization of what was going on or what he was saying.

"If that be true, then the statement, whether oral or written, would not be voluntary. A voluntary statement in the form of an admission or confession would necessarily have great weight. Yet if involuntary it would have no weight at all, because it would not be the product of the free will and understanding, and it should be disregarded.

"It is also contended that beyond the state of intoxication in which the defendant was at the time there were other circumstances which militate against the voluntary nature of the statements and confessions. It is contended that he was subjected to physical discomfort; that he was harassed and oppressed by the officers, and that the combination of these circumstances operating upon his intoxicated and confused mentality further tended to affect the voluntary nature of the confession and did, in fact, render it not the product of a free will, but rather that by all the circumstances, physical and mental, all the facts, the discomforts which it is claimed he was subjected to, the harassment, and those things, all tended to subject him to the will of his questioner, and made any statement, oral or written, which came from him involuntary by reason of his drunken condition and by force and pressure of the physical conditions which have been argued to you.

"It is for you, fairly and impartially, in the light of the evidence and your understanding of human nature, to examine into the question as to whether or not the statements were voluntary. If you believe they were not, you should altogether disregard them, put them altogether out of your mind, both those which may be favorable to the Government on the one hand and to the defendant on the other, altogether wipe them out as evidence in the case, and consider the case and reach your conclusion solely upon the basis of the other evidence in the case.

"If, on the other hand, after a dispassionate, calm, full, and fair consideration of all the circumstances and conditions bearing upon the making of the statements, you believe them to be voluntary in their nature, then you will accept them as evidence; you will consider them, give to them that weight which, in view of the other evidence in the case, you believe them to be entitled to.

"It may be that you will find the so-called oral confession voluntary; the written confession not voluntary, or vice versa. The circumstances may be somewhat different as to one or the other. I am not suggesting what your finding should be, but you will consider them separately in regard to the distinguishing features as to the particular statement, and of course consider the combination of circumstances which may relate to both of them, and after looking at it fairly and impartially, reject one or the other or both if you find them to be involuntary. Accept one or the other or both, as you find the facts to be, if those facts do tend in your opinion reasonably to support their voluntary nature.

"One word further as to the written confession. If you do reject the written confession as involuntary, then without it the evidence will not suffice to establish the crime of Murder in the First Degree, and I therefore instruct you, if you so reject that written confession, not to convict the defendant of murder in the first degree."

the District of Columbia, unless there was no evidence upon which the confession might be held to be voluntary[3]—in fact unless, on the contrary, the evidence of involuntariness was so clear and free from conflict that it was insufficient even to warrant presenting the question to the jury[4]—appellant's contention must fail.[5]

Although we considered this question carefully on the first appeal, two considerations have persuaded us, again, to analyze the entire evidence, and thus to provide a basis upon which, again, to answer the question. The first consideration resides in the fact that the conviction in the present case was for first degree murder and the punishment imposed was the death penalty. The second consideration arises from the action of the Supreme Court, in the case of Chambers v. Florida,[6] decided since the present case was argued and submitted, in holding that the proceedings there involved, in which confessions were utilized, failed to afford the safeguard of due process of law.[7]

The record discloses that the homicide occurred at approximately 3:30 o'clock on the afternoon of Sunday, August 22, 1937. Appellant was taken into police custody about three hours later at the apartment house where the deceased woman had lived, where she was killed, and where appellant worked as a janitor. At approximately 5 o'clock the following morning he made an oral confession of the killing, and at approximately 7:30 o'clock the same morning he signed a typewritten confession. Their voluntariness depends, therefore, upon ap-

pellant's condition and treatment during the period of approximately eleven to thirteen hours which elapsed between his arrest and the making of the confessions.

Appellant testified voluntarily in his own behalf that he was drunk on Sunday; that he had been drunk all the previous week; that he lay down and went to sleep at some time on Sunday; and that the next thing he knew anything about this case was Monday evening at the station house; that he did not know whether he signed the statement shown to him; that when he "came to" on Monday evening "it looked kind of dark" outside; he was in a cell with water on him; he told the officers he was cold, and they gave him a blanket to put around him; he then went back to sleep. He testified, first, that when he "came to" on Monday evening he did not remember whether there was anybody in the cell with him or not. In response to later questioning he testified that when he "woke up" on Monday evening "from being cold" there were 8 or 10 officers around him. Questioned further, he testified that it was Tuesday when he noticed the 8 or 10 officers around him, and then stated that the officers were not around him "but were walking on the outside."

Appellant offered the testimony of only one witness in addition to his own. That witness testified, in substance, that appellant was a drinking man; that witness had never seen him absolutely sober; that on Friday, before the Sunday Mrs. Anderson was killed, appellant was drunk from 7:00 P. M. to midnight; that he was very drunk

---

[3] McAffee v. United States, 70 App.D. C. 142, 105 F.2d 21, 24: "Under the law and practice in this jurisdiction, the duty of a trial judge in respect of an offered confession is first on *voir dire* to determine whether or not there is evidence upon which the confession might be held to be voluntary. If he concludes there is no such evidence, then he must exclude the confession from the case. But if, in his view, there is evidence from which it might be held to be voluntary, he must admit it in evidence and submit it to the jury under proper instructions."

[4] Such a situation was held to exist in Ziang Sung Wan v. United States, 266 U.S. 1, 16, 17, 45 S.Ct. 1, 4, 69 L.Ed. 131, where the Supreme Court said: "The undisputed facts showed that compulsion was applied. As to that matter there was no issue upon which the jury could properly have been required or permitted to pass. The alleged oral state-

ments and the written confession should have been excluded." See Perrygo v. United States, 55 App.D.C. 80, 2 F.2d 181; Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682.

[5] Wilson v. United States, 162 U.S. 613, 624, 16 S.Ct. 895, 900, 40 L.Ed. 1090: "When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury, with the direction that they should reject the confession if, upon the whole evidence, they are satisfied it was not the voluntary act of the defendant."

[6] 60 S.Ct. 472, 84 L.Ed. —, decided February 12, 1940.

[7] In the Chambers case, the due process clause of the Fourteenth Amendment was involved; in the present case, the due process clause of the Fifth Amendment.

on the following Saturday night; that he next saw appellant on the following Sunday night when he was in the custody of the officers, and at that time appellant "appeared to be still drunk."

From the case made on behalf of appellant, therefore, nothing appears to support the theory of compulsion, mistreatment, harassment, abuse, or third-degree questioning. His case was simply that he had been drunk for approximately one week prior to the homicide; that he was asleep or unconscious from approximately the time of the homicide until approximately twenty-four hours later, when he "woke up" or "came to," and found himself, wet and cold, in a cell. But there was a great deal of evidence, presented by the Government, of such nature as reasonably to satisfy the jury that appellant was not asleep or unconscious during the entire period.

The Government examined more than twenty witnesses, and it is upon the basis of their testimony that appellant's contention of involuntariness is made. One of these witnesses was an adopted niece of the deceased; one was the owner of the apartment house in which the homicide occurred; several were neighbors and acquaintances; several were police officers; four were physicians, one of these being attached to Emergency Hospital and the others being the Coroner and deputy coroners of the District of Columbia. There was some conflict in the evidence as to whether appellant was drunk and, if so, how drunk; there was some conflict as to the treatment accorded appellant while he was in custody; there was considerable direct evidence that the confessions were made voluntarily, without threats, intimidation, fear, distress, promises, or inducements of any kind, and no direct evidence to the contrary; there was substantial evidence that appellant was not wounded, or bruised, or marked in any manner, and there was no evidence to the contrary; all witnesses who testified upon the subject—and there were several—stated that appellant made no complaint of mistreatment or of physical discomfort at any time prior to the making of the confessions.

Stated most favorably in support of appellant's contention there was evidence to show that appellant was a drinking man; he had been drinking prior to the time of the homicide; he was seen sitting on the fender of a parked automobile, in a hard rain, between the time of the homicide and the time of his arrest, apparently in a drunken condition; he was drunk and asleep in his basement room at the time of his arrest, which occurred shortly after the homicide was discovered; he was taken upstairs and shown the body of the deceased woman; at that time he was "put in an armchair." As he sat in the room with the body: "He kept insisting that she wasn't dead, and said 'I love that white woman.' He said this probably a dozen times or more. . . . was cursing quite a lot. Several times . . . attempted to get out of the chair and go over to the body; several times, when told, he would sit down again, but once or twice, he wouldn't sit down, and was pushed down, . . .."; at 8:00 P. M. he was at the precinct station house in a drunken condition; at 9:00 P. M. he was in a drunken sleep in a cell, water was poured on his head to steady him; when wakened he was not himself; he was questioned intermittently for the next two or three hours; at about 10:00 to 10:30 P. M.[8] scrapings were taken from under his fingernails and his trousers were removed for examination of blood stains; at eleven or eleven-thirty appellant was raising his voice very high, using bad language, calling the officers names, whereupon one of them told him if he didn't stop calling them names "they would have to smack him;" at midnight he was drunk and garrulous; at that time he was sitting on a cot in a cell, but was then taken from the cell and to the captain's office where he identified a man whom he had earlier described to the officers as a companion of the deceased woman; he was then taken back to the apartment house where the homicide occurred; on this trip he was without trousers, but wore a light raincoat over full-length underwear; he was returned to the cell and at about 1:00 A. M. Monday morning was taken again to the captain's office where he was questioned for about two hours; at this time he had a "hangover," he "was talking incoherently at times, but he seemed to have his mental faculties in some respects;" he was in a cell for about two hours from 3:00 to 5:00 A. M., at which latter hour he asked for his trousers and was told by an officer— who had just returned from a two-hour in-

---

[8] One witness placed this event at midnight.

vestigation of statements previously made by appellant—that his trousers would be returned: "When you tell the truth." Thereupon, *i. e.*, at 5:00 A. M., appellant was taken from the cell to the detective's room; he was nervous, shaky, high-strung; the record at this point reads as follows: "The defendant was then told that the statement he had made from about 1 o'clock to about 3 o'clock concerning Mrs. Anderson and his activities and her activities were false; that the officers had checked every angle and the defendant had lied concerning many facts and defendant was then accused of killing Mrs. Anderson. He put his hands to his face and said that he had done a terrible thing, he had killed her. He wanted to kill himself. In fact, he had reached for Sergeant Christian's gun, begged for the gun, and said he wanted to kill himself; that he had killed the woman he loved."; this statement that he wanted to kill himself was made twice, first while he was making the oral confession and again thereafter; he was then taken again to the apartment house; it was raining and appellant got a little wet; at about 7:00 A. M. he was taken to police headquarters; it was still raining; at this time he was nervous and shaky; he was just coming out of a drunk; it was at this time that he signed a written confession; he was then taken back to the third precinct; at 10:00 A. M. Monday morning, approximately two and one-half hours after signing the written confession, a blood specimen was taken from appellant by a physician; he was more nervous then than he had been at 7:00 A. M.; he asked for a drink of whiskey and it was given him; at that time (10:00 A. M.) he complained about feeling ill and shaky and that his nerves were bad.

■ On the other hand there was evidence that the approximately thirteen-hour period involved was one of warm summer weather;[9] appellant was not wet or cold and made no complaint of being wet or cold; although there were showers of rain and although appellant's trousers were removed for approximately five hours, he was provided with other clothes and was fully clothed at all times when he was taken outdoors; he removed his own trousers willingly upon request and willingly permitted fingernail scrapings and other tests to be made.

As tending to show that appellant's mental condition was such as to make possible a voluntary confession, there was evidence that on Sunday afternoon between the time of the homicide and of his arrest, appellant carefully washed the blood from the furnace shaker, with which Henrietta Anderson was killed; at 8:00 P. M., although under the influence of liquor, he was in a happy mood, was laughing and joking, asked for a cigarette and was given one, said that "he had hit the numbers and he used that money to buy his liquor," gave the number he had hit and later at 1:00 A. M. gave the same number; at 8:00 P. M. appellant gave the name of a Mr. Moran as a companion of Mrs. Anderson, and at 1:00 A. M. identified as Moran, a man who was then brought into the precinct; at 9:00 P. M., after being steadied by having water poured on his head, he seemed to understand questions put to him and gave the officers much assistance in locating Mr. Moran; at 10:00 P. M., although appellant was "loud and boisterous" he could carry on an intelligent and coherent conversation; at midnight appellant was "steady and talking coherently," he was not drunk and answered questions very intelligently; when, between midnight and 1:00 A. M., appellant returned from the apartment house to the captain's office in the station house, "he walked all right and could answer questions well, although he was garrulous and appeared to be under the influence of liquor;" between 1:00 A. M. and 3:00 A. M. appellant answered questions clearly and coherently; at 3:00 A. M., he was "normal;" at 5:00 A. M., the time of his oral confession, "he was sober, and thoroughly understood the questions put to him, and knew what he was talking about;" shortly after appellant confessed at 5:00 A. M. he volunteered to take the officers to the apart-

---

9 We take judicial notice of the fact that the minimum temperature between 6:30 P. M. on Sunday, August 22, 1937, and 7:30 A. M. on Monday, August 23, 1937, was 66 degrees Fahrenheit, and that the maximum temperature during that period was 72 degrees Fahrenheit.

During ten hours of the period from 7:00 P. M. Sunday, to 4:00 A. M. Monday, the temperature remained constant at 72 degrees Fahrenheit. Monthly Meteorological Summary of the Department of Agriculture Weather Bureau for August, 1937 (Form No. 1030).

ment house and show them the "crowbar" that he had used to kill Mrs. Anderson; shortly thereafter in the basement of the house he "picked the furnace shaker off the furnace" and handed it to one of the officers; at that time "the effects of the liquor had worn off to the extent that defendant was undoubtedly himself;" at 6:00 A. M. the officers took appellant to the back door of a neighbor, Camille Balas, and at that time appellant "had a big smile on his face and said to witness 'Good morning, madam;'" between 7:00 and 7:30 A. M., at police headquarters, and before he signed the confession he "was in a very good frame of mind, and sat there and laughed and joked;" he was not drunk, but was sober and his mind was clear. The witness who typed appellant's confession testified as follows:

"the defendant talked, and as he talked, the witness wrote the words the defendant said, and after the defendant finished his statement, Sergeant Dalglish asked the defendant questions, and the defendant made answers to the questions, and the witness wrote down those questions and those answers. At the conclusion of this writing, defendant was told by Sergeant Dalglish that if there were any mistakes in the statement, the defendant should make those mistakes known, and they would be corrected according to the defendant's wishes. The defendant did not have his glasses, and Mr. Shimon went out of the office and came back with a pair of glasses, and the defendant said he could not read with them. Then, if witness remembers rightly, Sergeant Dalglish went to a drawer of a desk in the Homicide Squad, and took out one of those magnifying glasses, and the defendant held the magnifying glass up and just took his time and read the statement, and after that he signed the first sheet, and the second, and also the third sheet of the statement. Witness testified that, as he observed it, this statement was a voluntary one on the part of the defendant."

This summary indicates clearly that the question of voluntariness properly was submitted to the jury; and further, that the evidence was fully adequate to permit the jury's consideration of the confessions. Assuming that appellant was emotionally and mentally unstable, and even indulging in his favor a presumption that a sane man would not commit suicide,[10] it does not follow, in the light of the evidence in the present case, that he was without understanding or recollection of the acts committed, or that he was unable to make a reasonably accurate statement concerning them.[11]

There is no contention that appellant was insane. Except for the momentary emotional outburst, when, shocked by learning that his duplicity had been discovered, he confessed the killing, there is nothing even to suggest such a state of mind. And that was of short duration, indeed. Almost immediately he volunteered to show the officers the instrument with which he committed the homicide; within a half hour he greeted a neighbor with a smile; and within two hours joked and chatted while he waited to sign a typewritten confession.

In Bell v. United States,[12] this court stated the rule to be well settled "that the drunken condition of an accused when making a confession, unless such drunkenness goes to the extent of mania, does not affect the admissibility in evidence of such confession, but may affect its weight and credibility with the jury." The rule generally prevailing is that, in absence of total insanity, neither the voluntary character of a confession nor its admissibility is affected by the mental instability of the person making it. That condition is one for the consideration of the jury in determining the weight or effect to be given to the confession.[13]

---

10 Cf. Connecticut Mutual Life Ins. Co. v. Akens, 150 U.S. 468, 475, 14 S.Ct. 155, 37 L.Ed. 1148. Cf. also, 5 Wigmore, Evidence, 2d Ed. 1923, § 2500(c).

11 See District of Columbia v. Arms, 107 U.S. 519, 521, 2 S.Ct. 840, 27 L. Ed. 618.

12 60 App.D.C. 76, 47 F.2d 438, 74 A.L.R. 1098, and see cases there cited. See Note, 74 A.L.R. 1102.

13 See Commonwealth v. Zelenski, 287 Mass. 125, 128, 129, 191 N.E. 355, 357; People v. Lehew, 209 Cal. 336, 287 P. 337; Taylor v. State, 27 Okl.Cr. 165, 225

P. 988, 992; State v. Sirmay, 40 Utah 525, 537, 538, 122 P. 748, 753–754; Vinzant v. State, 28 Ala.App. 220, 180 So. 736, 737; People v. Rucker, 11 Cal. App.2d 609, 612, 54 P.2d 508, 510; State of Iowa v. Feltes, 51 Iowa 495, 1 N.W. 755; State v. Church, 199 Mo. 605, 631, 632, 98 S.W. 16, 22. See also, District of Columbia v. Arms, 107 U.S. 519, 2 S.Ct. 840, 27 L.Ed. 618. Cf. State v. Berberick, 38 Mont. 423, 442, 100 P. 209, 215, 16 Ann.Cas. 1077; State v. Campbell, 301 Mo. 618, 623, 257 S.W. 131, 133; People v. Shroyer, 336 Ill.

The case of Chambers v. Florida,[14] is clearly distinguishable from the present case. The Court, in the Chambers case, after analyzing the facts, summarized them as follows: "Over a period of five days they [the accused] steadily refused to confess and disclaimed any guilt. The very circumstances surrounding their confinement and their questioning without any formal charges having been brought, were such as to fill petitioners with terror and frightful misgivings. Some were practical strangers in the community; three were arrested in a one-room farm tenant house which was their home; the haunting fear of mob violence was around them in an atmosphere charged with excitement and public indignation. From virtually the moment of their arrest until their eventual confessions, they never knew just when any one would be called back to the fourth floor room, and there, surrounded by his accusers and others, interrogated by men who held their very lives—so far as these ignorant petitioners could know—in the balance. The rejection of petitioner Woodward's first 'confession', given in the early hours of Sunday morning, because it was found wanting, demonstrates the relentless tenacity which 'broke' petitioners' will and rendered them helpless to resist their accusers further." In the present case, appellant was in custody for only eleven hours prior to his confession; questions asked of him during the earlier hours of his incarceration were designed to secure information concerning others who were suspected of committing the crime; in fact he was not accused of crime at all, until his statements were checked and found to be untrue and, when at 5:00 A. M. he was first accused, he did not once deny his guilt, but immediately admitted the commission of the crime; there were no circumstances surrounding his confinement and questioning which were calculated to cause him any terror or misgivings and the evidence shows clearly that he was not terrified or fearful, or even that he complained of discomfort; there was no threat or fear of mob violence; there was no atmosphere of excitement or public indignation.

■■ It is next contended that the evidence disclosed that appellant was greatly intoxicated at the time the murder was committed, hence, that he was mentally incapable of the deliberation and premeditation necessary to constitute first degree murder; therefore, that the court should have withdrawn from the jury the question of appellant's guilt in that respect. There is no merit in the contention. There was conflicting evidence upon the subject of appellant's intoxication and of his mental condition. Under the circumstances the question was one of fact and was properly submitted to the jury to determine whether, by reason of drunkenness or otherwise, appellant's condition was such as to make him incapable of deliberation or premeditation.[15] Sabens v. United States,[16] relied upon by appellant, does not establish a different rule; on the contrary, it restates the rule as set out above. The ground for reversal in that case was not, as appellant contends, that the question of murder in the first degree should have been taken from the jury because of evidence showing intoxication, but that the jury was erroneously instructed with respect to that evidence. In the present case, on the other hand, appellant was afforded full and adequate protection by the trial court's charge that the jury could not find appellant guilty of murder in the first degree even if it found that he struck the fatal blows, if, at the time thereof, he was so overcome by alcohol that he could not premeditate or deliberate.

We have carefully considered appellant's other assignments of error and find them to be without merit. He was given a fair trial and was properly convicted.

Affirmed.

---

324, 168 N.E. 336. In State v. Sirmay, supra, the Utah court held that a confession made two days after an attempted suicide, and while accused was still suffering mentally and physically therefrom, was properly received in evidence.

[14] 60 S.Ct. 472, 478, 84 L.Ed. ——, decided February 12, 1940.

[15] Hopt v. People of State of Utah, 104 U.S. 631, 634, 26 L.Ed. 873. Intoxication was no defense, at common law, to the crime of murder. Bishop v. United States, 71 App.D.C. 132, 107 F.2d 297, 301. However, when murder in the first degree is defined by a statute such as the one here involved (D.C.Code (1929) tit. 6, § 21), in such terms as to require deliberate premeditation, for its commission, evidence of intoxication may be shown for the purpose of proving lack of capacity to deliberate or premeditate. See Notes, 12 A.L.R. 861, 883; 79 A.L. R. 897, 904.

[16] 40 App.D.C. 440.