[Criminal No. 859.   Filed October 5, 1937.]

[72 Pac. (2d) 435.]

# STATE OF ARIZONA, Appellant, v. AL DUGUID, Respondent.

Mr. Joe Conway, Attorney General, and Mr. W. E. Polley and Mr. J. M. Johnson, his Assistants; Mr. John W. Corbin, County Attorney of Maricopa County, and Mr. W. T. Choisser, his Deputy, for the State.

Mr. Herman Lewkowitz, for Respondent.

ROSS, J.—This is an appeal by the State of Arizona from an order granting a new trial to defendant, Al Duguid, convicted of driving an automobile upon the public highways while under the influence of intoxicating liquor. The grounds of the motion for new trial are as follows:

"I. That the court erred in the admission of testimony which was admitted in violation of the constitution—rights guaranteed this defendant.

"II. That the verdict of the jury is contrary to law.
"III. That the verdict is contrary to the evidence."

It is the contention of the State that the respondent had a fair trial, free from error, and that therefore the court's order granting new trial was arbitrary and erroneous and should be vacated and set aside. The burden of sustaining this contention is upon the appellant, for it is universally held that the trial court has a very broad discretion in the matter of granting new trials in both civil and criminal cases. 16 C. J. 1119, § 2620. And if there is any fair or just reason for the order, it will not be disturbed. The court's discretion, however, is a legal and not an arbitrary discretion and must be exercised in a legal manner. *Southern Arizona Freight Lines* v. *Jackson*, 48 Ariz. 509, 63 Pac. (2d) 193. When the object in granting a new trial is to promote justice and protect the innocent, and the record so discloses, the court's discretion is properly exercised. But if upon an examination of the record it appears no mistake of law or fact occurred in the trial, and that the evidence fully sustains the conviction, it is an abuse of discretion to grant a new trial. We will consider the three grounds of the motion in the order given.

The respondent, as required by the rules of the court, specified the point that he wished to present in his memorandum of authorities in support of his motion for a new trial. The memorandum is in these words:

"The admission of evidence on the part of Doctor Goss, one of the witnesses for prosecution, was in violation of article 2, section 10, Constitution of Arizona."

The court in granting the motion failed to give any reason therefor, but it was probably based upon re-

spondent's point that his constitutional rights had been violated, and on no other point, since no other was specified.

■■ After respondent's arrest, and on the same evening, he was taken by the arresting officer to Dr. H. L. Goss' clinical laboratory in the Physicians' Building in Phoenix, and Dr. Goss made a chemical analysis for ethyl alcohol in respondent's urine which he furnished the doctor. This witness was permitted to testify to the results of such analysis and to state his findings. The admission of the evidence, it is contended, compelled respondent to give evidence against himself, in violation of section 10, article 2 of the Constitution, reading as follows:

"No person shall be compelled in any criminal case to give evidence against himself."

The doctor's testimony was objected to on the ground that it was not shown respondent voluntarily submitted to the urine test. When this objection was made, the court took evidence on the question and thereafter admitted the testimony. As to whether respondent voluntarily furnished the sample of urine for analysis was a preliminary question for the trial court, whose discretion ordinarily would be treated as final. Under such circumstances, the burden is upon the respondent to show that he was coerced into giving the doctor such sample. *People* v. *Guiterez*, 126 Cal. App. 526, 14 Pac. (2d) 838. The respondent, in answer to questions by his counsel, testified:

"Q. Do you recall going to Dr. Goss' office? A. Yes, I remember being around there. . . .

"Q. When you got to Dr. Goss' office, did you know you were at a doctor's office? A. I knew where I was, yes.

"Q. You knew Harry Goss? A. No, I didn't know him personally, I wouldn't know the man again.

"Q. You didn't know him before that time? A. No.

"Q. What did you do or what did they do in the doctor's office? A. They took a sample of my urine.

"Q. What did the doctor say to you? A. I don't know that he said anything to me at all.

"Q. Did they ask you for a specimen of your urine? A. No, they just handed me something to urinate in, that was all.

"Q. And you did? A. Yes."

The arresting officer, Henry Warbasse, testified as follows:

"Q. Mr. Warbasse, when you had this defendant on February 6th, did you say anything to him about taking him to a doctor's office? A. Yes.

"Q. Where did you say that to him? A. When I took him out of the car I said he had better come along with me, he was in no condition to drive.

"Q. At that time had you arrested him? A. No, I hadn't told him he was under arrest at that time.

"Q. What did you say when you said something about going to the doctor's office and what did he say? . . . A. He said 'all right.' "

And on cross-examination:

"Q. And then after he was under arrest, why you said to him you wanted to take him to a doctor? A. Yes.

"Q. What else did you say why you wanted to take him to a doctor? A. I didn't tell him, I don't believe we told him.

"Q. You didn't tell him why you wanted to take him to a doctor? A. No."

Doctor Goss testified: "A. I made no other examination of him, except that of the urine test. We requested him to void the urine and from that our tests were made."

And on cross-examination:

"Q. You gave him a bottle or a tube to void urine in, didn't you? A. Yes.

"Q. And he did that, didn't he? A. Yes."

██ This evidence shows respondent acted under no compulsion but freely and voluntarily. Under such circumstances, there can be no doubt of the admissibility of the doctor's findings. The fact that respondent may not have known why he was asked to give Doctor Goss a sample of his urine will not render the doctor's analysis inadmissible. What was said in *Moon* v. *State*, 22 Ariz. 418, 429, 198 Pac. 288, 292, 16 A. L. R. 362, is quite in point:

"It is objected that it was error to admit in evidence the photograph of the fingerprints of the defendant for the reason that a defendant under the Constitution cannot be compelled to give evidence against himself. But the uncontradicted evidence shows that the defendant voluntarily suffered his finger print impressions to be taken which were photographed. There is no claim that any force or improper duress was used in taking the finger prints. It is clear that there was no violation of the constitutional rights of the defendant in suffering the photograph to be introduced in evidence. *People* v. *Sallow, supra* [100 Misc. 447, 165 N. Y. Supp., 915–925]."

And again in *Lee* v. *State*, 27 Ariz. 52, 61, 229 Pac. 939, 942:

"It is said the appellant was compelled to give evidence against himself. The basis for this assertion is that the officers who arrested appellant removed his shoes and thereafter used them for the purposes of comparison with the tracks found leading from the scene of the shooting to the Evans place, where appellant was afterwards found and arrested. It is the contention that the officers in taking the shoes from appellant's feet violated not only the federal but the state Constitution which provide that no person shall be compelled to give evidence against himself. Article 2, § 10. So far as the record shows the appellant did not object to his shoes being taken or to their use in the manner suggested. It may be doubted if the constitutional privilege now invoked was ever intended to exempt an accused from an exposition of

physical or natural marks or distinctions or characteristics, such as tracks, foot-prints, stains, and finger-prints. 4 Wigmore on Evidence, § 2265. The learned author thinks the privilege against self-crimination should be confined to testimonial utterances. As was said in *State* v. *Graham,* 116 La. 779, 41 So. 90:

" 'The tendency of the more modern case is to restrict the constitutional privilege against compulsory self-crimination to confessions, and admissions proceeding from the accused, and to open the door to the reception of all kinds of "real evidence" or proof of physical facts, which speak for themselves.'

"We think the cases are practically in accord in holding that the accused's shoes may be taken from his feet and used to compare with tracks, and afterwards introduced in evidence, when they are removed without objection and in the absence of compulsion. And some of the courts go so far as to admit such evidence when the act of the defendant is entirely involuntary, as where he is compelled by the officers to put his foot in the track for the purposes of comparison. *Lee* v. *State,* 69 Fla. 255, 67 So. 883, Ann. Cas. 1917D 236, and note; *State* v. *Thompson,* 161 N. C. 238, 76 S. E. 249; *State* v. *Sirmay,* 40 Utah 525, 122 Pac. 748; *State* v. *McIntosh,* 94 S. C. 439, 78 S. E. 327; *State* v. *Fuller,* 34 Mont. [12], 13, 85 Pac. 369, 8 L. R. A. (N. S.) 762 [9 Ann. Cas. 648]; *State* v. *Ancheta,* 20 N. M. 19, 145 Pac. 1086; 8 R. C. L. 183, § 175; 16 C. J. 566, § 1101."

See, also, *Garcia* v. *State,* 35 Ariz. 35, 274 Pac. 166.

There was no error in the admission of Doctor Goss' testimony.

The respondent apparently did not rely on the second and third grounds of his motion for new trial for he specified in his memorandum no point he wished to present to the trial court pertinent to such grounds. Both grounds are very general and it is improbable the court paid any attention to them. We have, however, examined the whole record, including the evidence, the court's rulings, and its instructions to the jury, for a reason for the order granting a new trial

and can find none. The verdict is not contrary to the law nor the evidence.

A short *résumé* of the evidence might not be amiss. Respondent, on the evening of February ·6, 1937, attended a party given by the Jesters at one of the principal hotels of the city of Phoenix, which lasted from about 8 to 10:30 or 11 P. M. Liquors were served and respondent admits he took two whiskies. The size of these drinks was not told but about 10:30 he left the hotel for home, driving through the streets of Phoenix to the two thousand block on West Van Buren Street. Here Henry Warbasse, a member of the Arizona Highway Patrol, who was traveling west on Van Buren Street, discovered respondent trying to drive his car into a driveway leading to his garage. At the time his headlights were out and, although the driveway was twelve feet wide, he was unable to direct his car into it, but in trying to do so hit one of the cement posts at the entrance. When the officer took him into custody he walked unsteadily, talked hesitantly, and smelled of liquor. His urinalysis showed "two milligrams of ethyl alcohol per cubic centimeter of urine." Doctor Goss explained how this much alcohol affects persons as follows:

"There are four ordinary standards which we use to determine drunkenness, depending upon the amount of alcohol which we recover in the urine or blood. This ranges from one to four or five milligrams per cubic centimeter. One milligram, a patient may be drunk, but decently so. Two milligrams, distinctly drunk. Three milligrams, usually drunk and disorderly. And four milligrams or more, dead drunk."

There was no evidence materially contradicting the State's case. One of his own witnesses said respondent drank "two scotch and sodas." Two others of his witnesses said they could not say how many drinks he took at the party. All of his wit-

nesses, five in number, said he was sober; that he was normal and that he was able to take care of himself, as they saw him in the hotel; also that he was a law-abiding citizen. These statements of his condition that evening at the hotel, although they may show respondent was not drunk, did not show, or tend to show, that he was not under the influence of intoxicating liquor at the hotel or on the public streets he traveled from the hotel.

When no error occurred in the trial, the evidence of guilt being so conclusive, we see no reason upon which to base the order for a new trial.

In *Hasten* v. *State,* 35 Ariz. 427, 280 Pac. 670, 671, we defined "under the influence of liquor," such definition being:

"It is a truism that a person who is even to the slightest extent 'under the influence of liquor,' in the common and well understood acceptation of the term, is to some degree at least less able, either mentally or physically or both to exercise the clear judgment and steady hand necessary to handle as powerful and dangerous a mechanism as a modern automobile with safety to himself and the public. With the increasing number and speed of automobiles on our highways, and the appalling number of accidents resulting therefrom, it is not strange that the law-making power determined that any person, who of his own free will voluntarily lessened in the slightest degree his ability to handle such vehicles by the use of intoxicating liquor, should, while in such condition, be debarred from their use. The Legislature has placed no limitation on the extent of the influence required, nor can we add to their language."

See, also, *Steffani* v. *State,* 45 Ariz. 210, 300 Pac. 615.

It was for the jury, under the evidence, to say whether defendant was under the influence of liquor, and they having spoken in the affirmative on that question, and no error appearing, it was an abuse of discretion to grant a new trial.

The case is remanded, with directions that the order granting a new trial be vacated and that further proceedings be had in accordance herewith.

McALISTER, C. J., and LOCKWOOD, J., concur.