Argued March 28; reargued May 15; affirmed June 19, 1945

# STATE *v.* CRAM

(160 P. (2d) 283)

Before BELT, Chief Justice, and ROSSMAN, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*Francis E. Marsh,* of McMinnville (Vinton, Marsh & Marsh, of McMinnville, on the brief), for appellant.

*Earl A. Nott,* District Attorney for Yamhill County, of McMinnville, for respondent.

BAILEY, J. The defendant, Carroll Loren Cram, was charged with and convicted of the crime of manslaughter committed in Yamhill county on March 26, 1944, while engaged in the doing of an unlawful act, to wit: Driving an automobile on a highway of the state of Oregon "carelessly and heedlessly in wilful and wanton disregard of the rights and safety of others and without due caution or circumspection, and at a speed and in a manner so as to endanger * * * the person or property of another, and while under the influence of intoxicating liquor" and by reason thereof brought about the death of Wanelda Henderson. Defendant has appealed.

1. The indictment alleged the commission of two unlawful acts by defendant: (1) Reckless driving, in the language of § 115-319, O. C. L. A., and § 23-406, O. C. L. A., as amended by chapter 439, Oregon Laws 1941, and (2) driving while under the influence of intoxicating liquor, in the language of § 115-318, O. C. L. A. See *State v. Laundy,* 103 Or. 443, 204 P. 958, 206 P. 290; *State v. Lockwood,* 126 Or. 118, 124, 268 P. 1016; *State v. Miller,* 119 Or. 409, 243 P. 72. As a consequence of one or both of these unlawful acts, the decedent met her death. Both were properly included in the indictment as a basis on which to predicate the charge of manslaughter. *State v. Laundy,* supra; *State v. Lockwood,* supra; § 26-711, O. C. L. A.

In the accident out of which the instant charge arose the automobile which defendant was driving capsized and he was rendered unconscious and remained in that condition for about 48 hours. While still unconscious he was arrested and taken in custody by a state police officer; was treated for injuries by Dr. John Manning, a physician and surgeon of McMinnville, Oregon; and,

at the request of the police officer, Dr. Manning was induced to extract a sample of blood from the defendant for the purpose of having the same analyzed to determine its alcoholic content, if any. This sample was taken by the officer to Dr. Joseph Beeman, Portland, Oregon, and there analyzed by him. Dr. Beeman testified that the sample "contained 260 milligrams of alcohol per one hundred cc's".

This evidence was objected to by the defendant on two grounds: First, that the relationship of physician and patient existed between Dr. Manning and the defendant and any information derived by Dr. Manning relative to defendant was confidential and privileged, (this objection is not urged here) "and on the second ground that under section 12, Article 1 of the Bill of Rights of the Constitution of Oregon, to permit testimony of this kind to be introduced would be in violation of the section which provides no person shall be compelled in any criminal prosecution to testify against himself, and that this is to be taken either as an admission or confession or as evidence of a physical examination."

Section 12, article I of the Oregon constitution, provides that "No person shall be * * * compelled in any criminal prosecution to testify against himself." The language of the fifth amendment to the constitution of the United States (which is limited to the federal government) is that no person "shall be compelled in any criminal case to be a witness against himself". The constitutions of all the states of the Union, with the exception of New Jersey and Iowa, contain provisions against self-crimination. 8 Wigmore on Evidence, (3rd Ed.) § 2252 (see footnote to this section for excerpts from state constitutions). There is a vari-

ation of wording in these constitutional clauses. The protection is from "testifying", from "furnishing evidence", or from "being a witness". This difference in phrasing has not been considered important. What the framers of the various constitutions sought to accomplish was to place "beyond the reach of ordinary legislative alteration" the privilege against self-crimination "as already accepted, understood, and judicially developed in the common law." 8 Wigmore on Evidence, §§ 2252, 2263. (The third edition is referred to unless otherwise indicated).

> "In the interpretation of the principle, nothing turns upon the variations of wording in the constitutional clauses; this much is conceded * * *. * * * These various phrasings have a common conception, in respect to the *form* of the protected disclosure. What is that conception?

> "Looking back at the history of the privilege (*ante*, § 2250) and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal process to *extract from the person's own lips* an admission of his guilt, which will thus take the place of other evidence. Such was the process of the ecclesiastical Court, as opposed through two centuries,—the inquisitorial method of putting the accused upon his oath, in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow-objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath.

> * * * * *

> "In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion*. The one idea is as essential as the other.

"The general principle, therefore, in regard to the form of the protected disclosure, may be said to be this: The privilege protects a person from any disclosure *sought by legal process against him as a witness.*" 8 Wigmore on Evidence, § 2263.

In Jones, Commentaries on Evidence, (2d Ed.), Vol. 6, § 2474, it is stated that the privilege against self-crimination "was established both on grounds of public policy and of humanity, 'of policy, because it would place the witness under the strongest temptation to commit the crime of perjury, and of humanity, because it would be to extort a confession of truth by a kind of duress, every species and degree of which the law abhors.'" It is further stated that the provisions in the federal and state constitutions against self-crimination "are generally held to be declaratory of the common-law rule, neither limiting nor enlarging it."

Professor Wigmore would not limit the constitutional privilege against self-crimination to testimonial utterances. The protection to the individual is "from any disclosure *sought by legal process against him as a witness.*" 8 Wigmore on Evidence, § 2263. The learned author includes within the orbit of the privilege "the production of *documents or chattels* by a person (whether ordinary witness or party-witness) in response to a subpoena, or to a motion to order production, or to other form of *process treating him as a witness* * * *. For though the disclosure thus sought be not oral in form, and though the documents or chattels be already in existence and not desired to be first written and created by a testimonial act or utterance of the person in response to the process, still no line can be drawn short of any process which treats him as a witness; because in virtue of it he would be at

any time liable to make oath to the authenticity or origin of the articles produced." All or practically all, the authorities concede the correctness of this rule. § 2264, *ibid.*

On the other hand, Wigmore concludes ",that documents or chattels obtained from the person's control *without the use of process against him as a witness* are not in the scope of the privilege, and may be used evidentially". Proof of their authenticity, or other circumstances affecting them, "may and must be made by the testimony of other persons, without any employment of the accused's oath or testimonial responsibility". Such documents and chattels are obtained "by physical search of the person or premises without calling upon the party for any act or utterance of his own." *ibid.* See also 22 C. J. S., Criminal Law, § 650, p. 995.

The only question before us for decision is whether the compulsory taking of the blood sample from the defendant and the admission of testimony disclosing its alcoholic content was a denial to the defendant of his privilege against self-crimination guaranteed by article I, § 12 of the constitution.

■ If the arrest of a prisoner is lawful, the officer making the arrest may search the person of the prisoner and take from him not only the instruments of the crime but also such articles as may be of use as evidence on the trial. The search is justifiable as incident to the lawful arrest. *Weeks v. United States,* 232 U. S. 383, 58 L. Ed. 652, 34 S. Ct. 341, L. R. A. 1915B 834. Ann Cas. 1915C 1177; *State v. Laundy,* supra (103 Or. at 496). The accused, upon his arrest, may be required to do many things without having his constitutional rights against self-crimination invaded. For the pur-

pose of identification he may be required to stand up in court; to appear at the scene of the crime (3 Wharton, Crim. Ev., 11th Ed., § 1141); to put on a blouse to see if it fits him (*Holt v. United States,* 218 U. S. 245, 54 L. Ed. 1021, 31 S. Ct. 2, 20 Ann. Cas. 1138); to place a handkerchief over his face (*Ross v. State,* 204 Ind. 281, 182 N. E. 865); to stand up and remove his glasses (*Rutherford v. State,* 135 Tex. Crim. Rep. 530, 121 S. W. (2d) 342); to remove his coat and shirt and permit the jury to see scars on his body and to don a shirt introduced in evidence (*State v. Oschoa,* 49 Nev. 194, 242 P. 582); or to exhibit his arm so as to reveal tattoo marks thereon, which a previous witness has sworn were there (*State v. Ah Chuey,* 14 Nev. 79, 33 Am. Rep. 530). He may also be fingerprinted, photographed and measured under the Bertillon system. *United States v. Kelly,* 55 Fed. (2d) 67, 83 A. L. R. 122, and cases therein cited; *Downs v. Swann,* 111 Md. 53, 73 A. 653, 23 L. R. A. (N. S.) 739, 134 Am. St. Rep 586; *Bartletta v. McFeeley,* 107 N. J. Eq. 141, 152 A. 17; *People v. Les,* 267 Mich. 648, 255 N. W. 407, and authorities therein cited; *Connors v. State,* 134 Tex. Crim. Rep. 278, 115 S. W. (2d) 681. For other instances, see 8 Wigmore, § 2265, footnote 2.

In *Holt v. United States,* supra, Mr. Justice Holmes, in writing the opinion for the court, stated:

"Another objection is based upon an extravagant extension of the Fifth Amendment. A question arose as to whether a blouse belonged to the prisoner. A witness testified that the prisoner put it on and it fitted him. It is objected that he did this under the same duress that made his statement inadmissible, and that it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a

prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof. Moreover, we need not consider how far a court would go in compelling a man to exhibit himself. For when he is exhibited, whether voluntarily or by order, and even if the order goes too far, the evidence, if material, is competent. Adams v. New York, 192 U. S. 585.''

*United States v. Kelly,* supra, involved the question of the return to the defendant of fingerprints taken against his will. The court, in denying the petition, stated, among other things, that ''Any restraint of the person may be burdensome. But some burdens must be borne for the good of the community. * * * The slight interference with the person involved in finger printing seems to us one which must be borne in the common interest.''

In the case at bar it is conceded that the defendant was in custody and under lawful arrest at the time the blood sample was extracted from his veins. He was unconscious at the time. However, prior to the trial both he and his counsel were advised by the district attorney that the blood sample had been taken. No motion was made for its return or for the suppression of evidence concerning it. No objection was made at the trial by defendant to the admission of testimony as to the extraction of blood or the analysis thereof on the ground that article I, § 9, Oregon constitution, prohibiting unreasonable search or seizure, had been violated. Moreover, counsel for defendant stated on oral argument that he was not now urging that the blood sample had been seized in contravention of article I, § 9 of the constitution.

The constitution of the state of Ohio provides that no person shall be compelled in any criminal case to be a witness against himself, but his failure to testify may be considered by the court and jury, and may be the subject of comment by counsel. In *State v. Gatton,* 60 Ohio App. 192, 20 N. E. (2d) 265, the defendant was charged with operating a motor vehicle upon a public highway while in a state of intoxication. He refused to accede to a request for either a blood test or a urinalysis, and evidence was introduced of his refusal to submit to such examination. Defendant objected to this evidence on the ground that it controvened his constitutional right by requiring him to testify against himself. After quoting extensively from Greenleaf on Evidence, (16th Ed., § 469e) the court observed that the evidence offered was not required to be given by the defendant himself but was given by the deputy sheriff and by the doctor called to make the examination. "We are unable", said the court, "to observe any merit in the defendant's claim that the introduction of such evidence violated his constitutional rights, and we believe, and hold, that the constitutional inhibition against self-crimination relates only, as stated by Greenleaf, to disclosure by utterance. No such disclosure was required of defendant in this case."

*State v. Gatton* was decided by the Court of Appeals of Ohio on May 12, 1938. In 1936 the Common Pleas Court of Hamilton county, Ohio, a court much inferior to that of the Court of Appeals, decided the case of *Booker v. Cincinnati,* 5 Ohio Opin. 433. The facts in that case tended to show that a doctor required the accused to "walk along a line" and that he made a urinalysis, examined the breath and pupils of the eyes of the prisoner. The court stated that "assuming that

the defendant was compelled to submit to tests against his will, and Doctor Hyman based his opinion in part at least upon those tests, the testimony of Doctor Hyman was inadmissible.'' The court, however, affirmed the judgment on the ground that the defendant had not shown that he was prejudiced by the admission of the physician's testimony.

In *State v. Duguid*, 50 Ariz. 276, 72 P. (2d) 435, the defendant was convicted of driving an automobile upon the public highways under the influence of intoxicating liquor. A chemical analysis for ethyl alcohol in defendant's urine was made and the result thereof furnished to a doctor who testified concerning such analysis. Admission of this evidence was objected to by defendant on the ground that it compelled him to give evidence against himself. The appellate court stated that the evidence showed that the defendant had acted freely and voluntarily and not under compulsion and that therefore the evidence was admissible. Although not material to the decision, the court cited and quoted with approval from cases in other jurisdictions expressing the view that the privilege against self-crimination should be confined to testimonial utterances.

Distinction is made by some courts between the admissibility of evidence of the result of a prisoner's affirmative act or acts under compulsion and the result accomplished without his active participation but against his will. This distinction is well illustrated in *State v. Griffin*, 129 S. C. 200, 124 S. E. 81, 35 A. L. R. 1227. There two questions were involved, to wit:

'' * * * (1) Was the testimony of the sheriff admissible. to the effect that he compared the shoe of the defendant with the tracks in the potato

patch, and that it fitted, when it appeared that he had forced the defendant to remove her shoe, and made the adjustment himself? (2) Was the testimony of the sheriff admissible, to the effect that he compelled the defendant to put her foot in the track, and that she would not do it in the right way?"

The first question was answered in the affirmative. The reason for so holding is thus stated: "In the case at bar the defendant was not being treated as a witness; the shoe and the comparison of the shoe with the track were not the testimony of the defendant, but of the sheriff, distinct from anything she may have said or done; the shoe was obtained from her control without the use of any process against her as a witness; she was not necessary to establish its authenticity, identity, or origin, which facts were established by the testimony of the sheriff." Many authorities are cited in support of this doctrine and it seems sound and logical to us. It is in accord with the weight of authority.

In answer to the second question presented, the court held that testimony as to the sheriff compelling the defendant "to put her foot in the track, and her conduct in doing so" was inadmissible for the reason that the defendant was required to do an affirmative act. "If the conformity had been perfect, that fact would have appeared from the enforced conduct of the defendant, clearly testimonial compulsion. If otherwise, as appeared, the inference of guilt from the effort to obliterate the track would have been a legitimate basis of comment".

Defendant, in *Apodaca v. State*, 140 Tex. Crim. Rep. 593, 146 S. W. (2d) 381, was charged with murder committed in the operation of an automobile on a public highway, while under the influence of intoxicat-

ing liquor. After he was arrested he was questioned and his answers were reduced to writing. He was required to walk, make sudden turns, hold out his hand, and make an effort to place a finger on his nose. He also was required to furnish a specimen of urine in order that it might be analyzed for the purpose of determining whether alcohol was present. All of these acts were required under compulsion. Over the defendant's objection that he had been required to give evidence against himself, in violation of the constitutional provision against self-crimination, one of the officers was permitted to describe the tests and to express his opinion, based upon the tests made, that the defendant was intoxicated. The appellate court held that error was committed in admitting this evidence, saying: "Demonstration by an act 'which tends to self-incrimination is as obnoxious to the immunity guaranteed by the Constitution as one by words.' "

No particular act of the defendant is singled out by the court. There is no discussion as to the admissibility of evidence of the urinalysis. The other evidence objected to was inadmissible under the holding in *State v. Griffin,* supra, concerning the acts done by defendant under compulsion. That question, however, is not here involved for the defendant Cram was not compelled to do anything.

Defendant Cram places much reliance upon *State v. Height,* 117 Iowa 650, 91 N. W. 935, 59 L. R. A. 437, 94 Am. St. Rep. 323, decided in 1902. Defendant therein was charged with rape. While in jail he was examined by physicians, not called by him, to determine whether he was suffering from a venereal disease, which, it was alleged, prosecutrix contracted from him. The examination was made under the direction of the pros-

ecuting attorney and was at first resisted by defendant, but later he submitted under duress. The appellate court ruled that the investigation was made without authority as against defendant's objection and that receipt of evidence of such examination was error "on the ground that it was the result of the invasion of defendant's constitutional right, impliedly guaranteed under the provision of our constitution as to due process of law, not to criminate himself."

It is observed by the court that although there is no provision in the Iowa constitution against self-crimination, there is a clause in that constitution against unlawful search and seizure similar to that found in the fourth amendment to the federal constitution. The court then refers to *Boyd v. United States*, 116 U. S. 616, 29 L. Ed. 746, 6 S. Ct. 524, and quotes extensively from the opinion in that case to the effect that evidence acquired through unlawful search and seizure is inadmissible. The court concluded that part of the opinion as follows:

" * * * The search was for the mere purpose of securing evidence by an invasion of the private person of the defendant, and we think there is no consideration whatever which will justify it. Without further elaboration or the multiplication of authorities, it is enough to say that the officers acted unlawfully in compelling defendant to submit to this examination, and all evidence with reference to information secured thereby should have been excluded on defendant's objection."

The ruling in the Height case, in our opinion, has been weakened greatly by later decisions of the court that rendered it. In *State v. Tonn*, 195 Iowa 94, 102, 191 N. W. 530, the court held that evidence obtained by illegal seizure was admissible, overruled its previous

decisions holding to the contrary, and refused to follow *Boyd v. United States.* Commenting on the Height case, the court said: ''We cited the Boyd case as sustaining the proposition that evidence so obtained could not be used against the defendant upon the trial of the crime. The case really turns, however, upon the proposition that the officers acted unlawfully in compelling the defendant to submit to the examination, which was, in effect, requiring him to furnish evidence against himself.''

*State v. Weltha,* 228 Iowa 519, 292 N. W. 148, involved the admissibility of evidence concerning a blood sample taken from an unconscious person under the following circumstances: The defendant Weltha was indicted for manslaughter, death being caused by the reckless driving of an automobile. He was found in an unconscious condition at the scene of the accident and removed to a hospital in Story county. While being treated by Dr. Lakwa, the coroner of another county by the name of Dr. Lewis ''proceeded to draw from defendant's arm the blood sample which was the subject of much controversy in the case.'' At that time no information had been filed against defendant and he was not under arrest. After stating that Dr. Lewis was not an official of Story county, the court said:

''  *  *  * We have here then a situation where a volunteer, without legal warrant and without express or implied assent, intrudes himself into an operating room and takes from an unconscious patient a blood sample to be used to make or sustain possible future criminal prosecution. We cannot bring ourselves to approve such a course; and we find no authority which requires us to do so. We do not overlook the many citations in the briefs, least of all our own decisions.

*  *  *  *  *

"We are not called on nor are we attempting to review or reconsider the rule of the Tonn and other cases cited. *Those decisions deal with persons under arrest or charged with crime.* We are not disposed to broaden the rule announced by them to permit an invasion of the person of a citizen under the circumstances disclosed by this record. * * * " (Italics supplied.)

*State v. Height,* supra, is not mentioned. The court, in arriving at its decision, gave much weight to the fact that the defendant at the time the blood sample was taken was not charged with any crime or under arrest.

In *State v. Benson,* 230 Iowa 1168, 300 N. W. 275, the court held that the refusal of a defendant to submit to a blood test might be shown to the jury. In this connection, the court said:

"Of course, when one is accused of a crime, he does not have to reply to the accusation. But if he declines to reply, his act of silence may be shown to the jury. We are of the opinion that the situation now before us is analogous. The request for a blood test did no more than inferentially accuse the defendant of intoxication. His refusal to submit is similar to a refusal to speak."

Missouri has followed the rule enunciated in *State v. Height,* supra. In *State v. Newcomb,* 220 Mo. 54, 119 S. W. 405, the defendant was charged with the crime of rape. While in custody he was ordered by the justice of the peace, at the demand of the prosecuting attorney, to submit to a physical examination by a physician who testified, over the objection of the defendant, as to the result of that examination. The appellate court held that this testimony should have been excluded as it was a denial of the defendant's privilege against self-crimination. *State v. Young,* 119

Mo. 495, 24 S. W. 1038, was cited as authority for its decision. That case involved the admission of statements made by defendant Young during his examination "before the coroner and jury of inquest." It had nothing to do with defendant's physical examination. The Height case is referred to without comment in State v. Newcomb. See also State v. Horton, 247 Mo. 657, 153 S. W. 1051; State v. Matsinger, (Mo.) 180 S. W. 856.

In Bethel v. State, 178 Ark. 277, 10 S. W. (2d) 370, defendants were convicted of the crime of rape and appealed. A physician was permitted, over the objection of the defendants, to testify on the day following the crime that, at the request of the sheriff, he had made a physical examination of both defendants and found them afflicted with a venereal disease. The judgment appealed from was reversed. The court, after referring to the provision in the state constitution against compelling a person in a criminal case to be a witness against himself, and quoting from two Missouri cases, stated: "This testimony did not tend to prove the crime charged, but only tended to prejudice, degrade, and humiliate them before the jury. The majority of the court is of the opinion that the court committed reversible error in admitting the testimony of Dr. McCall."

Bednarik v. Bednarik, 18 N. J. Misc. 633, 16 A. (2d) 80, involved the question of whether or not the court could require defendant and her daughter to submit to one or more blood grouping tests to determine the parentage of defendant's daughter. The application for the blood test, which was made by the plaintiff in a divorce proceeding, was denied in an opinion by Herr, advisory master, in which he stated that the

granting of it would, in his judgment, ''amount to an unconstitutional invasion of the right of personal privacy of the defendant and of the child.'' *Wragg v. Griffin,* 185 Iowa 243, 170 N. W. 400, 2 A. L. R. 1327, was a proceeding for a writ of *habeas corpus.* It was held there that the local board of health of the city of Des Moines could not detain, without clear and definite legislative authority therefor, a person suspected of having a venereal disease for the purpose of forcing the exposure of his body to physical examination and extracting blood from his veins in search of evidence of such disease, and that such detention was a deprivation of liberty without due process of law.

It is not necessary for us to express any opinion as to the correctness of the conclusions reached in the two cases last above-cited. We need not consider how far a court would go in requiring a man to submit to a blood test. See *Holt v. United States,* supra. Here the blood has already been extracted; defendant is not being called upon to submit to an examination.

The defendant was not deprived of any of his constitutional rights by the admission of the testimony here in question. He was not compelled to testify against himself. Evidence of the result of the analysis of the blood sample was not his testimony but that of Dr. Beeman, distinct from anything the defendant may have said or done. The blood sample was obtained without the use of any process against him as a witness. He was not required to establish the authenticity, identity or origin of the blood; those facts were proved by other witnesses.

If the evidence here under attack is inadmissible, it is difficult to understand under what theory fingerprints procured under compulsion, or evidence con-

cerning them, is admissible. It is equally difficult to comprehend why the defendant is not denied his constitutional privilege against self-crimination by being required to do the many acts hereinbefore enumerated.

■ In holding that the testimony concerning the blood sample was admissible we are not deciding that an accused can be forced to undergo a physical examination or to submit to a blood test. The question of unlawful search and seizure is not involved in this case. It is not being urged. Moreover, the defendant was under arrest at the time the blood sample was taken.

The judgment appealed from is affirmed.

ROSSMAN, LUSK, BRAND and HAY, J. J., concur.

———

BRAND, J., specially concurring.

I concur with the majority, but I think it proper to add a few words.

I agree that, upon the record before us, one question only is involved and that is whether the defendant has been compelled in a criminal prosecution to testify against himself within the meaning of Art. I, Sec. 12, of the Oregon Constitution. I agree with the so-called Wigmore doctrine as to the proper limitations and scope of the provision in question. It is a shield against testimonial compulsion. It protects the individual from any disclosure by him, whether verbal or otherwise, sought by legal process against him as a witness.

"It is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him. * * * It protects the individual from any disclosure, in

the form of oral testimony, documents or chattels, sought by legal process *against him as a witness."* (Italics ours.) *United States v. White,* 322 U. S. 694, 88 L. Ed. 1542, 64 S. Ct. 1248, 152 A. L. R. 1202.

The obvious and humane purpose of the provision is to protect the defendant from duress or torture, to exclude from evidence testimony presumably unreliable when obtained by such means, and to exempt him from being called as a witness against his will. Neither the taking of the blood, nor the evidentiary value of the testimony concerning its alcoholic content depended in the slightest degree upon any testimonial utterance or representation by the defendant. Had the defendant been required by legal process to extract from his vein a sample of blood and present it in court, a different situation would have arisen, for by producing it he would be vouching for it as being the sample which he was ordered to produce. Its relevance would then depend upon his implied testimonial representation that the thing produced was his blood. Not so here. He gave no testimony; no process issued against him; he vouched for nothing; nothing depended upon his testimonial responsibility. There was no more testimonial compulsion here than in any case in which officers, in the course of an arrest, take from the person of the defendant instrumentalities by which the crime was committed and then testify in court as to the origin of the things taken. No one would contend that a defendant is compelled to testify against himself merely because another as a witness testifies against him.

The difficulty with this case arises from the intermingling and confusion of two different, and, I believe, separate, rules—the rule against self-crimination,

and the rule against admissibility of evidence illegally obtained. The evidence concerning the alcoholic content of defendant's blood was not objected to on the ground that it was illegally obtained, but only as a violation of the privilege against self-crimination. The defendant had knowledge before trial that the blood sample had been taken and yet no timely motion to suppress the evidence was made.

There is, I think, but one theory under which the legality or illegality of the taking of the blood could become relevant upon this record. If the taking of the blood constituted an unreasonable search of the defendant's person within the meaning of Or. Const., Art. I, § 9, and if we should adopt the rule that all evidence obtained by an unlawful search is, by reason of that fact alone, inadmissible in evidence because its receipt would be a violation of the rule against self-crimination, then it would be necessary to consider the legality of the means by which the blood was secured in order to determine if the provision against self-crimination was violated by the receipt in evidence of the testimony.

The Supreme Court of the United States has recognized or established an intimate interrelation between the Fourth Amendment (searches and seizures) and that portion of the Fifth Amendment which provides that no person shall be compelled in any criminal case to be a witness against himself, and it has, in substance, held that the introduction of evidence obtained by unlawful search amounts to a violation of the Fifth Amendment. The doctrine is vigorously and logically criticized by Wigmore, 8 Wigmore, Evidence (3d. ed. 1940) § 2264, and by the New York Court of Appeals

speaking through Judge Cardozo in *People v. Defore,* 242 N. Y. 13, 150, N. E. 585, and by other authorities. While every doctrine of the United States Supreme Court commands respect, they do not all command obedience. The exemption from self-crimination is not safeguarded as against state action by the Fourteenth Amendment, nor is it a privilege or immunity of citizens of the United States. *Twining v. New Jersey,* 211 U. S. 78, 29 S. Ct. 14, 53 L. Ed. 97. The Supreme Court has said:

> "The 5th Amendment provides also that no person shall be compelled in any criminal case to be a witness against himself. This court has said that in prosecutions by a state, the exemption will fail if the state elects to end it." *Palko v. Connecticut,* 302 U. S. 319, 82 L. Ed. 288, 58 S. Ct. 149; *Snyder v. Massachusetts,* 291 U. S. 97, 78 L. Ed. 674, 54 S. Ct. 330, 90 A. L. R. 575; *Brown v. Mississippi,* 297 U. S. 278, 80 L. Ed. 682, 56 S. Ct. 461; *Buchalter v. New York,* 319 U. S. 427, 87 L. Ed. 1942, 63 S. Ct. 1129.

Since the first ten amendments are not limitations on state action except as funneled through the Fourteenth Amendment, and since the Fourteenth Amendment has not served as a conduit for the self-crimination clause of the Fifth Amendment, we are free to consider the relationship between Or. Const., Art. I, § 9 (search and seizure) and Art. I, § 12 (self-crimination) as a pure question of state law.

In this case it is unnecessary to decide whether the taking of blood was an unreasonable, and therefore an unconstitutional, search and seizure, or was merely a clear violation of the common law right to be free from assault and battery. Assuming that the taking was an unreasonable search and seizure, I am of the

opinion that this court should not extend the self-crimination clause by holding that it prohibits the receipt of all evidence obtained by means of an unlawful search and seizure. Approximately half of the states of the Union hold that evidence obtained by an unlawful search and seizure is not rendered inadmissible by that fact alone. To engraft the self-crimination clause upon the search and seizure clause and to hold that the former applied in all cases where the latter is violated would amount to a condemnation of the established common law of many, if not most, of our sister states on constitutional grounds.

In my opinion, the rule concerning the admissibility of evidence unlawfully obtained presents a separate problem of its own and the self-crimination clause should not be incorporated by judicial construction into the search and seizure clause of the constitution. This view once had the support of the Supreme Court of the United States, *Adams v. New York,* 192 U. S. 585, 48 L. Ed. 575, 24 S. Ct. 372, although that court has since repudiated it in so far as federal prosecutions are concerned. *Gouled v. United States,* 225 U. S. 298, 65 L. Ed. 647, 41 S. Ct. 261. The criticism of the federal rule which incorporates the Fifth Amendment into the Fourth Amendment of the federal constitution is adequately set forth by Wigmore, by the profound opinion of Justice Cardozo in *People v. Defore,* supra, and by other eminent authorities who need not be quoted at this time. The conclusion from the above considerations is that the illegality of the means by which the evidence of alcoholic content was obtained was not put in issue by the mere assertion by the defendant of rights under the self-crimination clause.

In the majority opinion it is said:

> "If the arrest of a prisoner is lawful, the officer making the arrest may search the person of the prisoner and take from him not only the instruments of the crime but also such articles as may be of use as evidence on the trial. The search is justifiable as incident to the lawful arrest."

And, again:

> "In the case at bar it is conceded that the defendant was in custody and under lawful arrest at the time the blood sample was extracted from his veins."

The text above quoted appears to relate to the legality of the means by which evidence was obtained rather than to the issue of self-crimination, but I do not understand that it is intended by the use of those words to imply by analogy that it was also lawful to take blood as an incident of a lawful arrest. I think the taking of the blood was an unlawful trespass, if not an unreasonable and unconstitutional search and seizure, which rendered both the officer and the physician liable, civilly and criminally. Many acts of officers in searching the body of an arrested person establish a prima facie case of assault and battery, but are not unlawful because justified by public policy under the police power. The opinion of the majority enumerates such instances. But the justification of the officers arises out of the common law principles long established. The common law which justifies the search of an arrested person and the removal of articles of his clothing has not established any justification for the taking of his blood. It would be one thing for the legislature, under proper limitations and restrictions, to authorize the taking of blood samples from persons under arrest, but

it would be quite another thing for the court to authorize so extreme an extension to the judicially established rules which justify the conduct of public officers in the public interest.

Rule 205 of the Model Code of Evidence prepared by the American Law Institute provides:

> "SELF - INCRIMINATION; BODILY EXAMINATION.
>
> "No person has a privilege under Rule 203 to refuse
>
> > "(a) to submit his body to examination for the purpose of discovering or recording his corporal features and other identifying characteristics, or his physical or mental condition, or
> >
> > "(b) to furnish or to permit the taking of samples of body fluids or substances for analysis."

The rule is followed by this comment:

> "This Rule like Rule 201 adopts the doctrine of the better considered cases that the privilege against self-incrimination applies only to prevent testimonial compulsion and has no application to compulsory exhibition of the body. * * * "

But it is to be observed that Rule 205 is a part of a proposed code which is recommended for adoption by legislatures.

The question as to the admissibility of evidence unlawfully obtained has been thought to be an open one in this state. Fraenkel, "Recent Developments in the Law of Search and Seizure," 13 Minn. L. Rev. 1. If so, we will, no doubt, be required to reexamine that question and adopt either the federal rule or the common law rule advocated by Wigmore. But the question is not before us here.

To say that the defendant "furnished" the blood and that, therefore, he was compelled to criminate himself, lends little aid in the solution of the problem. If by "furnished" one means merely that it was taken from him, then I agree. But the problem is no nearer solution. If by "furnished" one means that the defendant in some manner testimonially vouched for the fact that the blood was his, then we must all agree that the defendant did not "furnish" the blood. Either way, the question for decision is whether the Wigmore construction of the self-crimination clause should, or should not, be approved.

In his dissent the Chief Justice recognizes that the precise question is whether the self-crimination clause was violated, but much of what is said concerns the extent to which officers may lawfully go in obtaining evidence. It relates to unreasonable searches and to the mooted question as to the admissibility of evidence unlawfully obtained. In his condemnation of the conduct of the officer in taking the blood without the authority of any reasonably drawn legislative enactment, I concur. As to the admissibility of the evidence thus unlawfully obtained, I demur. That issue is not before us.

Mr. Justice LUSK and Mr. Justice HAY concur in the foregoing opinion.

----

BELT, C. J., dissenting:

To extract blood by hypodermic needle from a person accused of crime, without his consent and while he is unconscious, for the purpose of obtaining evidence to be used against him, shocks my sense of justice and

decency. It is law enforcement with a vengeance! It is law enforcement based upon violation of the law and ought not be approved by any court. The hypodermic needle was not inserted into the body of the defendant for the purpose of treatment. The doctor, upon request of the police officer, extracted the blood to be used in bringing about the conviction of the defendant. It was plainly an illegal act constituting an assault and battery upon the person of the defendant but it is believed that the doctor, in complying with the police officer's request, acted in good faith. It is true that the defendant was under arrest, but that is no justification for going beyond the realm of reasonable search. The zeal of the police officer ought never be permitted to transcend the constitutional rights of the accused.

The precise question is whether the evidence so obtained is inadmissible as being violative of the constitutional guaranty against self incrimination. Was the effect of such evidence to make the defendant a witness against himself? Was he compelled to furnish the evidence which tended to bring about his conviction?

This case is in the same category as those wherein force is exerted to obtain the blood test. Cases, as in *State v. Duguid,* 50 Ariz. 276, 72 P. (2d) 435, involving consent or acquiescence by the accused, are not in point. Obtaining evidence by such method from an unconscious person is more obnoxious than if obtained through compulsion, as in the latter instance the accused would at least know what was going on and have an opportunity to object.

It is conceded that the variation of wording in the constitutional clauses of the several states concerning

self incrimination has no legal significance. "Furnishing evidence" through compulsion or without the consent of the accused is a violation of the constitutional provision protecting the accused from self incrimination. But it is argued that the defendant did not testify concerning the blood test nor did he "furnish the evidence" used against him. If defendant did not furnish the blood, who did? The fact that there was no motion for suppression of the evidence is wholly immaterial. The blood was not offered in evidence. A doctor was permitted, over the objection of the defendant, to testify as to the result of the blood test.

The majority quote extensively from Wigmore, but it seems to me that the limitation which the learned professor puts upon the constitutional privilege against self incrimination fails to afford due protection to the accused against encroachment upon his personal rights. In the instant case, clearly no "oral utterance" was involved but what was done was, nevertheless, equivalent to compelling the defendant to be a witness against himself for, after all, it was his blood—extracted without his consent—which was speaking against him.

With all deference to my brethren of the majority, I think their construction of the constitutional provision in question is too narrow and limited. When the personal rights of the citizen, guaranteed under the constitution, are involved, the courts should be inclined to liberal interpretation. As said in 11 Am. Jur. 670, Constitutional Law § 59:

"It is a fundamental canon of construction that a Constitution should receive a liberal interpretation in favor of a citizen, especially with respect to those provisions which were designed to safeguard the liberty and security of the citizen in regard to

both person and property. * * * '', citing numerous authorities in support of the text.

True, the scope of the constitutional provision relative to self incrimination should not be so extended by judicial construction as to unduly thwart officers in the enforcement of the law. We should not be influenced by maudlin sentimentalism. Neither should we permit any stealthy encroachment upon the constitutional rights of a citizen even though he be accused of a crime. In bringing about convictions, methods which do not square with our sense of fairness and decency have no place in the proper administration of justice.

Courts have not stated any definite rule for determining what constitutes self incrimination. Indeed, it would be hazardous to do so. All courts agree that the constitutional guaranty extends to all testimonial utterances by defendant. It is also well established that it has no application to such physical evidential circumstances as may be revealed by open exhibition of the witness's body or by ordinary observation of his person. Clearly, he may be compelled to submit to such things as finger printing after arrest or to stand up in court for the purpose of identification: Wharton's Criminal Evidence (11th Ed.) Vol. 3, p. 1979. However, there are many borderline cases and, as to these, the courts are not in accord even when similar factual situations are involved: Wharton's Criminal Evidence (11th Ed.), Vol. 1, § 383. Some courts follow the strict Wigmore interpretation which, it is said, relates solely to "testimonial compulsion". Other courts give a broader and more liberal interpretation to the constitution and do not limit the privilege of immunity to the giving of oral testimony, but hold that it embraces as well the *furnishing of other evidence,* by the accused,

which might aid in establishing his guilt. In comment-
ing on these two lines of authorities, Jones in his
Commentaries on Evidence (2d Ed.), § 1391, says:

> "A far more liberal and, in the opinion of the
> author, a better construction has been placed upon
> the constitutional provision in other cases, where
> this class of testimony has been rejected on the
> ground that the court could not compel a witness
> to furnish evidence against himself."

In 28 R. C. L. 434, Witnesses § 20, it is said:

> "The rights intended to be protected by the
> constitutional provision that no man accused of
> crime shall be compelled to be a witness against
> himself are so sacred, and the pressure toward their
> relaxation so great when the suspicion of guilt is
> strong and the evidence obscure, that it is the duty
> of courts liberally to construe the prohibition in
> favor of personal rights, and to refuse to permit
> any steps tending toward their invasion. Hence,
> there is the well-established doctrine that the con-
> stitutional inhibition is directed not merely to the
> giving of oral testimony, but embraces as well the
> *furnishing of evidence by other means than by word
> of mouth,* the divulging, in short, of any fact which
> the accused has a right to hold secret. * * * "
> (Italics ours.)

Here we are not concerned with evidence concern-
ing the identification of the accused, as in finger print
cases. The question before us is whether the accused
can be compelled to furnish blood to be used as evi-
dence against himself. That evidence as to the result of
compulsory blood tests made for the purpose of deter-
mining whether a person accused of crime was intoxi-
cated violates the constitutional immunity from self
incrimination and is therefore inadmissible, see: *State
v. Height,* 117 Iowa 650, 91 N. W. 935, 94 Am. St. Rep.

323, 59 L. R. A. 437 (compulsory examination of defendant charged with rape to determine whether he was afflicted with a venereal disease); *Wragg v. Griffin*, 185 Iowa 243, 170 N. W. 400, 2 A. L. R. 1327, citing the Height case with approval (compulsory extraction of blood for a Wasserman test); *State v. Weltha*, 228 Iowa 519, 292 N. W. 148 (defendant motorist charged with manslaughter—involved intoxication. Blood extracted from defendant while unconscious in a hospital, without his consent. Admission of evidence relative to result of blood test held reversible error); *State v. Newcomb*, 220 Md. 54, 119 S. W. 405 (compulsory examination of defendant charged with rape to determine whether he suffered from venereal disease. Evidence as to result of examination held violative of constitutional right not to be compelled to be a witness against himself, citing *State v. Height*, supra); *State v. Matsinger* (Mo.), 180 S. W. 856; *State v. Horton*, 247 Mo. 657, 153 S. W. 1051; *Bethel v. State*, 178 Ark. 277, 10 S. W. (2d) 370; *Apodaca v. State*, 140 Tex. Crim. Rep. 593, 146 S. W. (2d) 381; *People v. Corder*, 244 Mich. 274, 221 N. W. 309; *People v. Akens*, 25 Cal. App. 373, 143 P. 795; *Elder v. State*, 143 Ga. 363, 85 S. E. 97; *Cooper v. State*, 86 Ala. 610, 6 So. 110, 4 L. R. A. 766, 11 Am. St. Rep. 84; *Stokes v. State*, 64 Tenn. 619, 30 Am. St. Rep. 72.

In *Bednarik v. Bednarik*, 18 N. J. Misc. 633, 16 A. (2d) 80, the court said:

> "To subject a person against his will to a blood test is an assault and battery, and clearly an invasion of his personal privacy. It involves the sticking of a surgical needle into his body. Perhaps the operation is harmless in the great majority of cases, although the risk of infection is always present. But if we admit such an encroachment

upon the personal immunity of an individual where in principle can we stop? Suppose medical discovery in the future evolves a technique whereby the truth may infallibly be secured from a witness by trepanning his skull and testing the functions of the brain beneath. No one would contend that the witness could be forced against his will to undergo such a major operation at the imminent risk of his life, in order to secure evidence in a suit between private parties. How then can he be forced to undergo a less dangerous operation, and at what point shall the line be drawn? To my mind it is not the degree of risk to life, health or happiness which is the determinative factor, but the fact of the invasion of the constitutional right to personal privacy."

If the court is to approve this method of extracting evidence from within the body of the accused, without his assent, we might well pose the question: Just how far will the state be permitted to encroach upon the personal rights of a citizen suspected of having committed a crime? Assume that A is arrested for larceny of a diamond and is suspected of having swallowed the gem. Will we approve the compulsory use of a stomach pump to obtain the evidence? Will the injection of "truth serums", or spinal punctures, or "lie detectors" be the next step? I recognize full well that the law is a progressive science but "progress" should not be accomplished by an invasion of rights guaranteed under the constitution.

Much of the majority opinion—aside from approval of the Wigmore interpretation—is devoted to a criticism of the cases above cited holding such evidence inadmissible. It is noteworthy, however, that there is a paucity of authority cited supporting the contention of the respondent. *State v. Gatton,* 60 Ohio App. 192,

20 N. E. (2d) 265—an intermediate court of appeal—is not in point. The question there was whether the state could comment upon the refusal of the defendant to submit to a blood test. No test was made. The constitution of Ohio (Art. I, § 10) provided:

"No person shall be compelled, in any criminal case to be a witness against himself; but his failure to testify may be considered by the court and jury and may be the subject of comment by counsel. * * * *"

This decision is contrary to the well-reasoned earlier case of *Booker v. City of Cincinnati,* reported in 5 Ohio Opinions 433.

No person accused of crime can be required by "oral or written utterances", or the equivalent thereof, to criminate himself. In the instant case, it is shown by uncontradicted evidence that defendant, while in the custody of the law, was compelled by an unlawful act to furnish evidence to be used against himself. This method of transgressing defendant's constitutional rights was just as effective as if he had been compelled by "oral or written utterances" to criminate himself.

Both the federal and state constitutional provisions relative to search and seizure and self crimination were enacted to safeguard and protect the personal security of the citizen. Evidence obtained by unlawful search and seizure and introduced against a person accused of crime has the effect of compelling such person to criminate himself: *Agnello v. United States,* 269 U. S. 20, 70 L. Ed. 145, 46 S. Ct. 4, 51 A. L. R. 409; *Gouled v. United States,* 255 U. S. 298, 65 L. Ed. 647, 41 S. Ct. 261; *United States v. Lefkowitz,* 285 U. S. 452, 76 L. Ed. 877, 52 S. Ct. 420, 82 A. L. R. 775; *Boyd v. United States,* 116 U. S. 616, 29 L. Ed. 746, 6 S. Ct. 524; *Fulton*

*v. City of Philadelphia,* 168 Miss. 30, 148 So. 346; *State v. Slamon,* 73 Vt. 22, 50 A. 1097, 87 Am. St. Rep. 711.

Mr. Justice Clark in *Gouled v. United States,* supra, commenting upon these constitutional provisions, in reference to the introduction in evidence of papers obtained through search and seizure, said:

> " * * * In practice the result is the same to one accused of crime, whether he be obliged to supply evidence against himself or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers. In either case he is the unwilling source of the evidence, and the Fifth Amendment forbids that he shall be compelled to be a witness against himself in a criminal case."

Since it is shown by uncontradicted evidence that personal rights guaranteed under the constitution have been violated, this court, in the interests of due administration of justice, might well take cognizance of the question of unlawful search and seizure, even though counsel on oral argument stated that he did "not urge it now". Unlawful search and seizure was not a ground of objection in the lower court; but was assigned as error and argued as such in the brief of appellant.

I think the judgment of conviction should be reversed and the cause remanded for a new trial.